## Commonwealth *v.* Souder, Appellant.

Argued September 29, 1953. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

*James P. McArdle,* for appellants.

*Harry A. Estep,* with him *Charles D. Coll,* for appellee.

OPINION BY MR. JUSTICE CHIDSEY, January 11, 1954:

This is an appeal from the decision of the Superior Court reported at 172 Pa. Superior Ct. 463, 94 A. 2d 136, which reversed the order of the Court of Quarter Sessions of Allegheny County sustaining motions in arrest of judgment made by the defendants following their conviction by a jury of conspiracy and fraudulent conversion. The Superior Court entered the following judgment: "The order is reversed, the verdicts are reinstated, and the defendants are ordered to appear in the court below for sentence at such time as the court shall direct.".

In addition to their motions in arrest of judgment, defendants moved for a new trial. The lower court made no disposition of the latter motions, stating that because of its arrest of the judgments, it was unnecessary to consider the motions for new trial.

For the reasons given by the late Judge DITHRICH in his opinion for the Superior Court, we will affirm its conclusion that the lower court erred in sustaining the motions in arrest of judgment but we must reverse the action of the Superior Court in directing the defendants to appear for sentence, for the reason that defendants' motions for new trial remain undisposed of.

Accordingly, the judgment of the Superior Court reversing the lower court's order sustaining defendants' motion in arrest of judgment is affirmed, with direction that the record be remanded to the lower court for disposition of the defendants' motions for new trial.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The defendants are firemen of the Borough of McKees Rocks. In 1931 the then firemen of that municipality formed, through a first class charter obtained from the Court of Common Pleas, a non-profit corporation known as the McKees Rocks Firemen's Relief Association. It later also became the McKees Rocks Firemen's Protective Association.

In 1939 the Borough of McKees Rocks passed an ordinance providing that the McKees Rocks Firemen's Protective Association was to be officially recognized by the Borough Council "as an organization formed for the purpose of maintaining an association for beneficial and protective purposes, to its members and their families in case of death, sickness, temporary or permanent disability or accident, from the funds collected therein." The ordinance did not set up any machinery for the collection, depositing, investing and distribution of funds. Each year the Borough Treasurer paid over to the Association the foreign insurance tax fund

(allowed by Statute) and this fund was divided among the members with the understanding that they were "to purchase self-insurance protection wherever they could."

For eleven years this procedure was followed with the full knowledge of the borough officials, the fiscal officers and all those who had anything to do with the disposition of the foreign insurance tax fund. At no time during all those years did the firemen have any reason to believe that there was anything improper, much less illegal, about receiving these fees in addition to their modest wages.

The statute which authorized in the first instance the payment of these foreign insurance tax moneys to the fire departments throughout the State did not specify that the money was to be used in any particular manner except for the benefit of relief associations. It is common knowledge that the duties of a fireman subject him to hazards which in many respects imperil life and limb as much as those which press upon a soldier in battle. Pennsylvania has hundreds of volunteer fire companies composing thousands of firemen who are ready day and night to dash into the murky arena of fire, smoke, explosion and combustion without thought of compensation save the satisfaction of discharging one's duty to one's fellow man and one's community.

When the legislation here involved was enacted, there were more volunteer fire departments than paid departments, as indeed there are today. The assignment of the moneys in question partook of the nature of assistance vitally needed by the volunteer fire departments. Since even a paid fireman can never receive a salary commensurate with his risk of life and limb (as indeed who could ever pay a soldier adequately

for what he undergoes?) it was decided to make no distinction between paid and unpaid fire departments.

In 1950, as the result of a grand jury investigation which initially was in no way concerned with fire departments or fire department funds, the defendants were charged with criminally accepting the foreign insurance tax funds which had duly and officially been paid to them by the Treasurer of the Borough of McKees Rocks. At the ensuing trial the firemen were convicted of fraudulent conversion and conspiracy.

A court en banc made up of Judges KENNEDY, ADAMS and DREW found that the evidence was insufficient to sustain the verdicts, and discharged the defendants. The Commonwealth appealed to the Superior Court which reinstated the verdicts. The defendants then appealed to this Court which has affirmed the decision of the Superior Court.

By affirming the decision of the Superior Court, this Court has in effect legislated a new crime; it has created, through a decision which gives no reasons for its conclusions, a criminal offense which did not theretofore exist. It has, without so stating, overruled prior decisions of this Court covering similar transactions. The present Chief Justice, speaking for this Court in the case of *Commonwealth v. Weiner,* 340 Pa. 369, 375, said, where a defendant had been convicted of fraudulent conversion: "The question was not whether defendant had the right to withhold this money but whether in good faith he *believed* he had such right. He would be guilty of conversion under the statute *only if at the time he retained the money he knew he was not entitled to it."* (Emphasis supplied.)

The record in this case is absolutely barren of any evidence that the defendants were ever informed they were not entitled to the money officially paid to them by the treasurer of the borough. There was no evi-

dence that the Auditor General, the State Treasurer, the borough officials, or any member of the McKees Rocks Fire Department, or any one else, officially or unofficially, ever even suggested that they should not accept the foreign insurance tax collections duly turned over to them by the Borough treasurer.

But there is something even more significant than this to emphasize the innocence of the defendants. Not only were they not informed that their acceptance of the foreign insurance tax fund was tainted with illegality; *they were affirmatively notified by the decision of a Court of this Commonwealth* that it was *legal and proper* for the McKees Rocks firemen to collect the tax fund paid to them by the Treasurer of their employer municipality.

In 1937 the McKees Rocks Firemen's Relief Association entered a suit against the First National Bank of McKees Rocks for $850.85, being funds which had been paid over by the Commonwealth from foreign fire insurance tax collections. The bank petitioned for an interpleader because another group of firemen also using the name of the McKees Rocks Firemen's Relief Association was claiming the same money. An issue was framed between Group A and Group B. Both groups were in fact the Relief Association, but at different times. Since civil service did not then and does not yet wholly protect firemen of McKees Rocks in permanency of position, a fireman's tenure can be as shaky as the ladder on which he stands in reaching through space to achieve a precarious burning ledge. Thus the members of Group A banked the money while *they* were the Relief Association. When they were ousted, Group B became the Relief Association. Not long afterward Group B fell in a political turnover and Group A again donned helmet and rubber boots, only themselves once more to slide down the slippery pole

of dismissal. Thus, when the case was argued and decided in Court, Group A was not the Firemen's Relief Association of the day. The Court nonetheless decided for Group A on the basis that they were the Association when the money was paid by the Commonwealth. This established conclusively in law that title to the funds vested *permanently* in the Firemen's Association when paid. If what the Supreme Court says today is true, then neither Group A nor Group B was entitled to the funds in dispute. The adjudication, however, was otherwise and no appeal was taken from that decision. From the date of the entering of that judgment, March 19, 1938, there never flickered throughout the length and breadth of McKees Rocks a scintilla of doubt about the legality of the receipt, distribution and expenditure of funds received by the Association from premiums paid by foreign fire insurance companies operating in the Borough.

To declare now that the defendants are guilty of fraudulent conversion under a state of facts which, in another case, involving a similar principle of law, established no criminality, is to announce that the citizenry of the Commonwealth may not be guided by the adjudication of the Courts. It is to provoke intemperate cynics into the hyperbole that the courts are buildings of straw, their edicts and decrees mere scraps of paper and their judges unworthy of quotation.

The essence of the crime of fraudulent conversion is the converting to one's use of money or property belonging to another. The only entity entitled to the money here involved was the McKees Rocks Relief Association. The defendants, with two others, *were* the McKees Rocks Relief Association. It is absurd to say that the defendants could fraudulently convert money which belonged to themselves. The members of the Association unanimously agreed that the money paid

to the Association was to be distributed for individual insurance purchase. No one objected to this procedure: the Borough, the Commonwealth, the insurance officials—no one. Whether the men actually purchased any particular type of insurance protection or not is not the controlling feature of the case. To make out the crime of fraudulent conversion the Commonwealth had to prove that the men withheld money to which they were not entitled. That fact the Commonwealth did not establish.

The defendants were convicted because of a forced interpretation of the Statute of April 25, 1929 (P. L. 709) which stated that the municipal treasurers were to pay over the money forthwith to the "Relief Fund Association of the fire department, or of such fire company, or fire companies, paid or volunteer," engaged in the service of the municipality and "duly recognized" as such by the legislative body of such municipality. It is axiomatic that criminal statutes are to be construed strictly. This statute specifically states that the money shall be paid to the relief fund association which, of course, is what the McKees Rocks Firemen's Protective Association was. But it must be added at once that the Act of 1929, the basis of this criminal action, is *not* a criminal statute! Thus, eight men are to be stigmatized with crime because of acts arising through the operation of a statute not criminal.

As already stated, the defendants were convicted of conspiracy as well as fraudulent conversion. The Superior Court does not mention the conspiracy conviction at all, nor does the majority opinion of this Court, but the crime of conspiracy is a serious one. It connotes stealth, secrecy, clandestine design for evil purposes. There is not a word of testimony in the entire record to suggest, much less prove, that the defendants conspired to take the money involved. For

eleven years they received the money,—received it openly, honestly and honorably in the same manner that they accepted their modest stipend. The law, as everyone understood the law to be, provided they should accept it. Suddenly, without any change in the law, without the firemen being made aware that impropriety attended their receiving the money, they were arrested, indicted, tried and convicted. To say that this comports with the traditions of American fairness and American justice is to say that the action of that Roman emperor who inscribed the criminal laws high on pillars so that they could not be read nonetheless properly informed the inhabitants of the criminal code.

It would, in my opinion, be piling insult upon injury to say here that, without extenuation, ignorance of the law is no excuse. This oft-repeated maxim is very much misinterpreted. What it means is that *professed* ignorance cannot be accepted as a defense. The person who claims he does not know that a contemplated act is illegal when universal experience, common sense and every day observation proclaim its illegality is bound to fail in his asserted ignorance which, in reality, is a camouflaged cunning. But where one's brain, heart and soul are convinced through every avenue of knowledge open to man that a certain procedure is legal, the law is not so savage, cruel and devoid of reflection as to punish for what one does not know. No system of justice worthy of the name would criminally punish the citizen who stumbles over an edict in the dark. Moreover, without knowledge there can be no criminal intent and *without criminal intent there can be no crime.*

In every true criminal case there is a victim. There was none here. The Commonwealth paid over the money to the Relief Association as required by statute

and therefore lost nothing. The Borough of McKees Rocks suffered no loss because it never had any right to the money. The Association was not harmed because the members were the Association.

One of the firemen members of the Association, Andrew Ellick, died as the result of injuries sustained in a fire, and it has been asserted that had a relief fund been established, his widow would have received benefits thereunder. But the failure of a relief fund for widows was not the fault of the members of the McKees Rocks Firemen's Protective Association. The fault lay in the Legislature and the Borough. The foreign insurance tax paid to McKees Rocks amounted to about $2,000 a year. This was not enough to maintain an adequate relief or pension fund. Had the General Assembly, by legislative fiat, declared the formation of a relief or a pension fund, the Borough could and undoubtedly would then have provided the machinery for the formation and development of a fund that would have brought to Mrs. Ellick a pension over and above the compensation she received through the Workmen's Compensation Act prior to her remarriage. The children of Andrew Ellick continue to receive workmen's compensation. It is to be noted particularly in this regard that Andrew Ellick received, prior to his death, his proportionate share of the funds turned over to the Protective Association. He received it with the understanding that he would purchase his own insurance protection. It is, therefore, in my opinion, quite unfair to suggest that the defendants in some way deprived Ellick's widow of something she was entitled to, when the facts show that she suffered absolutely no loss whatsoever because of any fault of the defendants.

The Commonwealth argued below and here that when the Borough Council officially recognized the

McKees Rocks Firemen's Protective Association it did so with the proviso that the funds turned over to it would be used only for the purposes set forth for that organization, namely, "for the purpose of maintaining an association for beneficial and protective purposes, to its members and their families in case of death, sickness, temporary or permanent disability or accident, from the funds collected therein." The lower court, in its Opinion, very properly rejected this view, pointing out that "Section 2 of the resolution which designated this protective Association as the proper organization to receive the 2% foreign insurance tax moneys, *did not attempt to restrict its use.*" (Emphasis supplied.) To the lower court's accurate observation in this regard I would add that although the Borough resolution stated that the Protective Association was to be recognized as the organization formed for the purpose of "maintaining an association, etc.," it did not say HOW the association was to function in maintaining an association for beneficial and protective purposes. The Borough ordinance was simply an empty frame ready to receive plans, procedure, and forms as to how the money in question was to be applied for payment to members in case of sickness, etc. Since the implementing legislation or regulations never followed, the firemen continued to follow the established routine of permitting each fireman in his own way to provide for insurance protection.

It is quite obvious that the system of handling foreign insurance tax money in Pennsylvania fire departments leaves much to be desired, but the correction should come through administrative action and not through criminal prosecution. It should come about through legislation in the halls of the Legislature or ordinances in the chambers of Council, and not in the criminal courts where, as here, it was quite apparent

no criminal intent was present during the entire 11 years that the system has been in operation.

The opinion of the Superior Court, which has been affirmed by the majority of this Court, states: "if . . . the borough had no relief fund, then one should have been established or the money paid back to the State." But the responsibility to establish the relief fund was one devolving upon the Borough itself. How can the individual members of a fire department be held criminally liable for the failure of the municipal authorities to provide the machinery for a relief fund? There was no legal responsibility on the part of the members of the fire department to employ attorneys, insurance experts and whatever other technical assistance might be required in order to build such an organization. Their job was to fight fires, not prepare legal papers.

The defendants here have been victimized by a situation not of their own choice and which was contrary to their own interests and desire. It would have contributed much to their own welfare and peace of mind if an appropriate relief system and a pension fund had been organized. They had the right to assume that the men of the law and the men in official position would protect the firemen themselves in the event of death or injury, just as the firemen stand ready to protect the lawyers, judges and office-holders against the disastrous and ever-menacing scourge of fire. While faithfully discharging their duties as firemen, these defendants suddenly find their good names being threatened with entombment beneath a falling wall which they had reasons to believe was entirely safe. They are being humiliated and disgraced by the law which is intended to protect and not destroy. Much is being said these days about lawlessness and disrespect for the criminal code, and, to a great extent, the criticism is justified. But every citizen is entitled to know what

the law is, and the very least that he is entitled to, is to depend on legislators, judges, and courts to tell him what the law is. We have seen here that by statutes enacted in our state legislature, by ordinance passed in the municipal legislature, by decisions handed down by Courts of this Commonwealth, and by a procedure accepted by all officialdom as legal and proper, these defendants had every right to believe that in accepting the tax fund paid to them through official channels they were accepting what the law authorized. To blacken with criminality an act sanctioned by the law for eleven years is to make of the criminal code an engine of oppression and entrapment.

I cannot find it in me to conclude other than that the decision of the majority of this Court works a grave injustice on eight innocent men, eight guardians of the safety of the borough of McKees Rocks, eight American citizens entitled to the protection of the law as *written* and not as decided upon *after* the performance of thitherto legally recognized actions.

The affirmance by the majority of the Superior Court's decision not only inflicts a great injustice on the defendants, as deplorable as that is; it accomplishes an even greater harm in that it strikes at the very pillars of the stability of the law. If the guarantees contained in court decisions, borough ordinances and legislative enactments can be consumed by the fire of a swiftly changing appraisement of constitutional and legal values, what does the fireman, the policeman and the every day citizen have to assure him that what he is doing today and which is universally recognized as legal may not be branded tomorrow by an appellate court as illegal and criminal?

The honor and respect which go with a good name acquired through years and decades of honest living should not be subjected to so unreasoning, so unrea-

sonable and so un-American a fear. Despite the presence of crime and criminals which seems inevitable in a certain small fraction of any population, we are a law-abiding nation, but the law which is to be abided by must be clear, precise and indubitable. It must not be a miasma of doubt and foreboding. The majority decision of this Court in this case contributes uneasiness and not reassurance, it conduces to apprehension and not security. It tinges self-reliance with an anxiety which should never exist in a freedom-loving people.