353 A.2d 372
**COMMONWEALTH of Pennsylvania**
**v.**
**Darryl WEBSTER, Appellant.**

Supreme Court of Pennsylvania.
Argued Oct. 4, 1974.
Decided Oct. 3, 1975.
Rehearing Denied March 25, 1976.

See also, 457 Pa. 101, 320 A.2d 115.

John J. Dean, John H. Corbett, Jr., Pittsburgh, for appellant.

John J. Hickton, Dist. Atty., Robert L. Eberhardt, Robert L. Campbell, Asst. Dist. Attys., Pittsburgh, for appellee.

Before EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

NIX, Justice.

This appeal arises as a result of appellant's conviction of murder in the second degree for his participation in the fire-bombing death of Mrs. Mary Amplo. On the

evening of April 6, 1968, a firebomb was thrown through the living room window of the home of the victim, igniting her clothing and causing severe burns which ultimately resulted in her death two months later.

Before addressing the merits, we deem it appropriate to comment upon the procedure followed in this case. First, immediately after the jury announced its verdict, sentence was imposed. Thereupon the trial court advised appellant of his right to file post-trial motions and in event of the denial of these motions, he was advised of his right of appellate review. The Public Defender was appointed to represent him in these proceedings. This is clearly in violation of our present rules of criminal procedure. The Comment to Pennsylvania Rules of Criminal Procedure 1123, which was adopted June 8, 1973 (effective July 1973), states:

"Post-verdict motions must be decided before sentencing, because the appeal lies from the final Order of the trial court, which includes sentence. See Appellate Court Jurisdiction Act, 17 P.S. §§ 211.102(6), 211.-202(1), and 211.302."

See Pa.R.Crim.P. 1405, Comment, relating to the sentencing procedure which provides:

"The sentencing proceeding should not take place until all post-verdict motions have been disposed of, . . ." (This Rule was adopted July 23, 1973) (Effective date October, 1973).[1]

Recent decisions of this Court have stressed the importance of post-trial motions to the appellate process. *Commonwealth v. Blair,* 460 Pa. 31, 331 A.2d 213 (1975); *Commonwealth v. Reid,* 458 Pa. 357, 326 A.2d

[1]. While these rules in their present form were not in effect at the time of the trial in the instant case (September 1969), it has long been the accepted practice in this jurisdiction that "a pending motion in arrest of judgment or motion for a new trial should be disposed of before sentencing." *Commonwealth v. Blum,* 210 Pa. Super. 529, 534, 233 A.2d 613, 615 (1967). See also *Commonwealth v. Souder,* 376 Pa. 78, 101 A.2d 693 (1954).

267 (1974); *Commonwealth v. Goodman,* 454 Pa. 358, 311 A.2d 652 (1973). We therefore take this opportunity to emphasize the need for trial courts to comply with our rules requiring the disposition of these motions before the imposition of sentence.

Subsequently, post-verdict motions were filed with the trial court. After being directed by the court en banc, to file a brief, appellant's counsel sent a letter to the trial judge in which he stated *inter alia:*

" . . . after studying the Motion and Transcript of said case, it is my opinion there is no legal basis to the Appeal.

Alternately, filing a Brief in this matter said above would probably not convince the Court to reverse said conviction." [2]

Thereupon the court en banc entered an order striking the motions for a new trial and in arrest of judgment after finding that these motions had not been properly prosecuted and were therefore abandoned. No appeal was taken from this order.[3]

On January 15, 1973, Webster filed a petition seeking post-conviction relief and, after a counselled evidentiary hearing, the court entered an order permitting a direct appeal to be entered as if timely filed but rejected the other bases for post-conviction relief. Although Webster alleged ten grounds in support of the prayer of the petition in addition to the alleged denial of his right to appeal in the proceedings below, he subsequently appealed the denial of relief to this Court raising only the issue of

2. We note that counsel's actions in this case, as reflected in the above-quoted correspondence, clearly does not comport with the standard of advocacy required by our cases. *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967); *Commonwealth v. Baker,* 429 Pa. 209, 239 A.2d 201 (1968). See generally A.B.A. Standards Relating to the Defense Function, §§ 8.2, 8.3 and 8.4 and Commentary (1971).

3. The date of the above-referred to order of the court en banc was February 26, 1971.

ineffective assistance of trial counsel. In an opinion decided May 22, 1974, this Court affirmed the ruling of the lower court as to this issue. *Commonwealth v. Webster,* 457 Pa. 101, 320 A.2d 115 (1974). The matter presently before us is a direct appeal pursuant to the ruling of the post-conviction hearing court. In this appeal, appellant has chosen to raise two of the issues formerly presented in his post-conviction petition.

Here again, the procedure followed in the court below is at variance with that suggested by this Court. We have stated that where a post-conviction court determines that a petitioner is entitled to a direct appeal, no decision should then be made on other bases alleged therein for post-conviction relief. See *Commonwealth v. Bricker,* 458 Pa. 367, 369, n. 2, 326 A.2d 279, 280 (1974). See also, *Commonwealth v. Harris,* 443 Pa. 279, 278 A.2d 159 (1971); *Commonwealth v. Robinson,* 442 Pa. 512, 276 A.2d 537 (1971). This procedure is preferable since it allows all of the complaints that may be raised to be disposed of in one action.

Further, the court directed that the appeal should be made directly to this Court pursuant to the Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, No. 223, art. II, § 202(1), 17 P.S. § 211.202(1) (Supp.1974–75). This procedure, however, omits a critical stage in the appeal process. As a result of the court's order, there was no opportunity for filing, arguing and disposing of motions in arrest of judgment and for a new trial by the trial court. The preferable procedure would have been to allow appellant the opportunity to file with the court below post-trial motions. However, in the interest of judicial economy, we will entertain this appeal at this time and treat the lower court's denial of these specific grounds in its order in the post-conviction hearing proceeding as if it was in effect a denial of post-trial motions.

The appellant raises the question as to whether the confession of a 16-year-old suspect should have been suppressed on the basis that he did not knowingly and intelligently waive his constitutional rights. The suppression court and the post-conviction hearing court concurred in the view that there was an effective waiver and thus concluded that the confession was properly admitted.

In reviewing the testimony, mindful of the principle that on review we will consider only the evidence of the prosecution's witness and so much of the evidence for the defense as, fairly read in the context of the entire record, remains uncontradicted, the court's findings will not be disturbed where it is supported. *Commonwealth v. Stafford,* 451 Pa. 95, 301 A.2d 600 (1973); *Commonwealth v. Sharpe,* 449 Pa. 35, 296 A.2d 519 (1972).

Officer Walton, a member of the homicide division of the Pittsburgh police department after receiving information that Darryl had witnessed the incident, went with a fellow officer to the home of appellant on November 20, 1968, at 11:40 A.M. Darryl was then age 16 and in the tenth grade in high school. Walton testified that he advised Darryl and his mother that they wished to question him about the incident as an informational witness and not as a suspect. After indicating to his mother his willingness to go with the officers, Darryl left the house alone in the company of the police officers, with his mother's consent.

The officers testified that upon their arrival at police headquarters, Webster was again advised that he was not under arrest, that he was not obligated to answer any questions and that he could consult with any attorney at any time. Walton also cautioned Darryl that if there was any chance of implicating himself, it would be to his best interest to refuse to answer any questions. Approximately after ten minutes, before appellant had made any incriminatory statements, another team of officers arrived and advised Walton that they had learned Darryl

was, in fact, implicated in the firebombing. The interview was immediately stopped and Walton telephoned Darryl's mother to advise her of their intention to formally charge her son as an accomplice to the arson-murder. Mrs. Webster was permitted to speak with Darryl and after she had finished, advised Officer Walton she did not object to the police questioning him because "the truth is going to come out one way or the other anyhow." She indicated to the officer that it was up to Darryl to decide if he wished to be interviewed.

After the conversation with Mrs. Webster, Darryl was fully advised of his constitutional rights, informed of the nature of the charges that were going to be preferred against him and the probable consequences if he were to be found guilty. According to Walton's testimony, Darryl remarked that "If the other boys are going to talk, I better get my side in also. Because they are not going to put everything on me." Darryl then made a preliminary oral statement, followed by a formal statement which was transcribed by typewriter. The statement contained a detailed account of how Darryl and several other youths had obtained the raw materials for several primitive firebombs; how they had constructed the bombs; and how two of the youths had thrown the bombs at Mrs. Amplo's house. At the conclusion of the statement, Darryl corrected one minor factual detail, read the typewritten transcript aloud, initialed each page, and signed it at the end.

Darryl also testified at the suppression hearing and contended that he had fabricated the story because he was afraid that he would be beaten by the police if he did not implicate himself. Although he admitted that he had not been physically abused by the officers, he charged that he was in fact in fear because he had been given a "dirty look" by Officer Walton while they were enroute to police headquarters and that Officer Walton told him "When we get you to the station, you will speak

up." He stated that although Walton told him he (Walton) had spoken to his mother over the phone, Walton did not give him an opportunity to speak to her. While he claimed he was not given his warnings prior to his oral admissions, he did concede that he was so advised before the written statement was commenced.

Interestingly, Mrs. Webster was not called during the suppression hearing although she did testify at the trial where the issue of voluntariness was again raised. During the trial, Mrs. Webster equivocated as to whether she had given permission to the officers to take Darryl to police headquarters. Further, although admitting receiving a call from Officer Walton from police headquarters, she denied that he advised her that her son was to be charged as an accomplice in this crime or that her permission was sought to interview him. She stated that the officer called her for the sole purpose of telling her that they were giving her son lunch.

While appellant's argument as to the alleged involuntariness of his confession was framed in general terms upon a theory of psychological coercion, the core of the contention was that we should not find an effective waiver where the suspect was age 16 and was called upon to make such a choice without the benefit of the judgment of counsel or the mature guidance of a parent or guardian. Heretofore, although recognizing the need to scrutinize with special care any incriminating statement obtained from a youth during police custodial interrogation, we have refrained from announcing, as a blanket rule, that a 16-year-old youth is legally incapable of waiving his constitutional rights and confessing to a crime. *Commonwealth v. Davis*, 455 Pa. 142, 314 A.2d 313 (1974); *Commonwealth v. Moses*, 446 Pa. 350, 287 A.2d 131 (1971).

A number of our recent decisions are most instructive on this subject. In *Commonwealth v. Roane*, 459 Pa. 389, 329 A.2d 286 (1974), we reversed the murder con-

viction of a 16-year-old accused and ruled that his confession should have been suppressed. In that case, the mother followed her son and the police to police headquarters. Upon her arrival, she was given no information concerning the whereabouts of her son and was required to wait over an hour, when by chance, she noticed her son being accompanied by a detective to a water fountain in the hallway where she had been sitting. When Mrs. Roane attempted to seize this opportunity to speak with her son, she was denied access to him by the detective who took the youth to another interrogating room. After another period of approximately one hour, during which her inquiries pertaining to her son's whereabouts were left unanswered, Mrs. Roane noticed the door ajar to an interrogation room and entered uninvited. Upon finding her son in the room she had entered, she again asked for permission to confer with him and was granted the right, but urged to speak up so that their conversation could be heard by the officers present. At the commencement of the written statement when the right to counsel was read to the youth in his mother's presence, Mrs. Roane informed the officers that she wished to obtain a lawyer for her son. This request was ignored and the taking of the formal statement began. When Mrs. Roane protested, one of the officers urged her "Let him talk, maybe it will make him feel better."

Commenting upon these facts, we stated in that opinion:

> "An important factor in establishing that a juvenile's waiver of his constitutional rights was a knowing and intelligent one would be evidence that, before he made his decision to waive those rights, he had access to the advice of a parent, attorney, or other adult who was primarily interested in his welfare." *Commonwealth v. Roane, supra* at 394, 329 A.2d at 288.

In *Roane, supra,* we rejected the Commonwealth's contention that the fact that the mother was present during

the actual taking of the formal statement cured any prior taint in the process.

". . . Mrs. Roane's mere presence is not enough. In order to support a finding that Daryl's waiver of his rights was knowing and intelligent we believe that the record must indicate that Mrs. Roane had an opportunity to give Daryl the kind of helpful advice discussed in *Gallegos*, (*Gallegos v. Colorado*) *supra*. [370 U.S. 49, 54–55, 82 S.Ct. 1209, 1213, 8 L.Ed.2d 325 (1962)] The instant case reveals no such opportunity. Instead, the record makes clear that at no time was Mrs. Roane permitted to talk with her son alone. Rather, when she did try to talk with Daryl, one officer intruded, asking her to speak up so that she and her son could be heard, and another tried to dissuade her from the advice she was attempting to give . . ." *Id.* at 395–396, 329 A.2d at 289.[4]

Similarly, in *Commonwealth v. Starkes*, 461 Pa. 178, 335 A.2d 698 (1975), where a mother was used by police officials to urge her 14-year-old son to give an incriminatory statement without first being appraised of his rights under the Fifth and Sixth Amendments, we stated:

"Where an informed adult is present the inequality of the position of the accused and police is to some extent neutralized and due process satisfied. However, where the adult is ignorant of the constitutional rights that surround a suspect in a criminal case and exerts his or her influence upon the minor in reaching the decision, it is clear that due process is offended. An uninformed adult present during custodial interrogation presents an even greater liability. The minor in such

4. See also *Commonwealth v. Irvin*, 462 Pa. 383, 341 A.2d 132 (1975) [J–82 of 1974], where we held that the deliberate design to keep a 17-year-old suspect from his adult relatives during the crucial period of the interrogation process was a significant factor in the totality of the circumstances suggesting that the resulting confession was involuntary.

a situation is given the illusion of protection, but is in fact forced to rely upon one who is incapable of providing the advice and counsel needed in such a situation.

Unless we require police officers to also advise parents, who are in the position to counsel minor suspects during custodial interrogation, we will not only fail to assure the full benefits sought to be attained by this type of counseling but we will also increase the likelihood that the suspect will be misinformed as to his rights.

Here the first incriminatory statements came only after the mother's entreaties that the young man 'tell the truth . . .' Regardless of how laudable the mother's motives, we cannot obscure the primary consideration as to whether the minor fully realized that he was not legally required to make any statements which would tend to incriminate him or to respond to questions without the presence of counsel. Where a parent is present we must at least require that parent to be advised of the rights possessed by the minor suspect before that parent may be permitted to influence the decision which the minor must make. Whether the pressure to respond to police questioning flows from the overzealousness of the police or the unadvised entreaties of a well-intentioned parent, the result is equally offensive to our concept of due process and frustrates the protection sought to be provided by our Constitution." *Id.* at 188–189, 335 A.2d at 703. (Footnote omitted).

In our most recent pronouncement on this subject in *Commonwealth v. McCutchen*, 463 Pa. 90, 343 A.2d 669 (1975) [J–156 of 1975], we held that it was not sufficient when the mother of a 15-year-old youth was brought by police to confer with her son prior to the taking of the formal confession but after he had made oral incriminatory statements.

"The Commonwealth, in an effort to distinguish the instant case from our decisions of *Roane* and *Starkes, supra,* argues that appellant's confession was voluntary because he did not ask to have his mother present, and that because of his prior experience with the police, he was aware of the consequences of his confession and did not need guidance in deciding whether to confess. We are of the opinion that these arguments do not take this case out of our *Roane* and *Starkes* rationale. . . .

In the instant case, the Commonwealth admits that appellant's mother was not present when he gave his first informal confession but was only taken in to see appellant when his final confession was taken. Under these facts, *it is clear that prior to appellant giving his first confession,* which was in essence the same as his later formal confession, *appellant, age fifteen, was not given the opportunity to consult his mother before he waived his rights, an opportunity, in our opinion, mandated by our Roane decision." Id.* at 92–93, 343 A.2d at 670. (Emphasis added).

██ It is clear from these cases that not only may the Commonwealth not interfere with the right of a minor suspect to consult with a parent or guardian throughout the interrogation process, more importantly, police officials must make a reasonable effort to provide an opportunity for the youthful accused to confer with and receive the benefit of counsel or an interested and informed adult guidance before permitting him to elect to waive these important constitutional rights.[5]

---

**5.** While we do not accept the thesis that all confessions of minor offenders elicited without the benefit of counsel or an adult confidant must necessarily be rejected, the younger and more immature the offender the greater is the government's responsibility to provide an opportunity for the counselling of an attorney or the guidance of an informed parent or guardian. See generally, Little, Paul M: "Due Process Reasons for Excluding Juvenile Court Confessions from Criminal Trials" 50 Calif.L.Rev. 902 (1962).

 The evidence presented during the suppression hearing in the instant case provided more than ample basis for a finding that the mother freely acquiesced in her child's initial decision to accompany the police to their headquarters as an informational witness.[6] Further, the testimony also justifies a finding that the police notified the mother when they became aware of appellant's changed status, from a possible witness to a suspect. However, although the mother was given the opportunity to confer by phone with her son prior to further interrogation, the Commonwealth's evidence fails to establish that the mother was then advised of the rights of an accused as mandated by *Miranda v. Arizona.*[7]

As stated in *Starkes, supra,* it is not only necessary that the minor offender be afforded a reasonable opportunity to receive adult guidance in making an election to waive his rights, it is equally imperative that the parent or guardian be informed of the rights of a person in such a predicament. The Commonwealth's evidence is totally lacking of any testimony that would support a finding that the mother was advised, by police officials, of the rights of an accused prior to or during her conversation

---

**6.** Although at trial the mother's testimony was offered to suggest that she was not fully aware of her right to refuse to permit her son to accompany the police, this testimony was at best unpersuasive.

"Q. Officer Walton then did tell you that he didn't believe Darryl was involved in this thing, is that right?

A. He didn't say anything. All he said was, 'We're going to take him downtown and talk to him. We'll probably bring him back.'

Q. Didn't they ask your permission and didn't you tell—

A. I had to give permission for them to take him.

Q. And you did give your permission for them to take him?

A. Yes, uh-huh.

Q. They explained that they didn't want to take him down without your permission, and that he wasn't under arrest, is that right?

A. He didn't say anything about any arrest. All he said was that he came to get Darryl, he wanted to talk to him, and that he'd bring him back, and that was it." (N.T. 235-6)

**7.** 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

with her son after learning that he was to be charged in the arson-killing. Nor is there any other basis to assume that the mother may have gained this information from another source. We thus must conclude as we did in *Starkes, supra,* "where the adult is ignorant of the constitutional rights that surround a suspect in a criminal case and exerts . . . influence upon the minor in reaching the decision, it is clear that due process is offended." *Id.* at 188, 335 A.2d at 703.

The burden of proving by a preponderance of the evidence, that the accused's confession was obtained after a knowing and intelligent waiver is upon the Commonwealth. *Commonwealth v. Starkes, supra; Commonwealth v. Goodwin,* 460 Pa. 528, 333 A.2d 892 (1975); *Commonwealth v. Ewell,* 456 Pa. 589, 319 A.2d 153 (1974); *Commonwealth v. Fogan,* 449 Pa. 552, 296 A.2d 755 (1972); *Commonwealth ex rel. Butler v. Rundle,* 429 Pa. 141, 239 A.2d 426 (1968). Giving the Commonwealth's testimony full credence and ignoring all contradictions offered by the defense, the testimony fails to establish that the mother was adequately informed to provide the proper assistance and guidance in making the decision to waive the minor's constitutional safeguards.[8] It would have been a simple matter for Officer Walton, during the conversation with the mother in which he advised her that her son was to be criminally charged in the matter, to have then explained to her the constitutional rights of an accused. The mere conference between an uninformed parent and a child cannot meet the standard announced in our cases in *Roane, supra; Starkes, supra;* and *McCutchen, supra.*

8. We find unpersuasive the Commonwealth's argument that Darryl was motivated to speak as a result of learning of the statements made by his companions. Where we are concerned with a minor declarant, our inquiry is not limited to his motive for responding to police questioning but more importantly whether before reaching that decision he had the opportunity to confer with an informed and interested adult.

We thus find that the Commonwealth has failed to establish an effective waiver and therefore the statement was improperly admitted into evidence.

Judgment of sentence reversed and a new trial is ordered.

JONES, C. J., took no part in the consideration or decision of this case.

POMEROY, J., filed a dissenting opinion.

EAGEN, J., dissents.

POMEROY, Justice (dissenting).

## I

The Court's decision today ordering the suppression of appellant's confession, in my view, confounds all logic. On the one hand, the Court states that "we do not accept the thesis that all confessions of minor offenders elicited without the benefit of counsel, or an adult confidant must necessarily be rejected." Opinion of the Court, *ante* at n. 5 [typewritten copy at 11.] [1] Nonetheless, the sole reason for the Court's determination that appellant's waiver of his constitutional rights was not knowing and intelligent is the fact that appellant's mother was not advised of her son's constitutional rights prior to conferring with him before his interrogation. This ill-conceived per se rule was first promulgated by the Court in *Commonwealth v. Starkes*, 461 Pa. 178, 335 A.2d 698.[2] It is, in my opinion, totally without basis in law or logic.

The constitutional rights of a juvenile, like those of any other person, are personal to the individual. Only

1. Indeed, if that were the Court's rule, no reversal would be required herein since Darryl Webster had full opportunity to consult with his mother prior to confessing.

2. Mr. Justice Eagen wrote a dissenting opinion in *Starkes*, which was joined by Mr. Chief Justice Jones and this writer. 461 Pa., *supra*, at 190–191, 335 A.2d at 703, 704.

he may waive those rights, not his parents or any other adult. If this is so, then it is clear that even had appellant's mother been advised of her son's constitutional rights and subsequently advised him not to waive them, this fact alone would not necessarily preclude this Court from finding that appellant's waiver of those rights was voluntary under the traditional totality of circumstances test for voluntariness.[3] *Commonwealth ex rel. Butler v. Rundle,* 429 Pa. 141, 239 A.2d 426 (1968). See *Commonwealth v. Davis,* 455 Pa. 142, 314 A.2d 313 (1974); *Commonwealth v. Porter,* 449 Pa. 153, 295 A.2d 311 (1972); *Commonwealth v. Moses,* 446 Pa. 350, 287 A.2d 131 (1971); *Commonwealth v. Darden,* 441 Pa. 41, 271 A.2d 257 (1970), *cert. denied,* 401 U.S. 1004, 91 S.Ct. 1243, 28 L.Ed.2d 540 (1971) for the application of that test to confessions by juvenile defendants. The trial court applied that test in this case, and properly, in my view, found no merit to the claim that appellant's waiver of rights and confession were involuntary.

At the time of Darryl Webster's interrogation by the police for his part in the killing of Mary Amplo, he was 16 years of age, in the tenth grade and apparently of at least average intelligence. There is no indication in the record that he did not fully appreciate his rights and understand what he was doing when he confessed. Upon being advised of his rights as required by *Miranda v. Arizona* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and being told of his suspected involvement in the firebombing, he replied, as the majority records, "If the other boys are going to talk, I better get my side in also. Because they are not going to put everything on me." Opinion *ante* at 378. There is no uncontradicted evi-

---

**3.** There is no doubt that in the case of a juvenile special care must be taken to insure that any waiver of rights and any confession is truly voluntary. Furthermore, it is possible to conceive of situations where a youth may be so young or immature or mentally retarded that he might be incapable, as a matter of fact, of waiving his rights without adult assistance.

dence of coercion of Webster by the police or any evidence of police brutality, either direct or psychological in nature. In my mind, it is clear that appellant's confession was motivated by the knowledge that an accomplice had implicated him in the firebombing and that his confession was his free and voluntary act.

## II

Another reason compels my dissent in this case. Assuming that the Court is merely following the precedent established in *Commonwealth v. Starkes,* 461 Pa. 178, 335 A.2d 698, I see no reason why this appellant should receive the benefit of our decision there. Following his conviction in September 1969, Webster took no appeal. On January 15, 1973, he filed a petition under the Post-Conviction Hearing Act, Act of January 25, 1966, P.L. (1965) 1580, § 1 *et seq.,* 19 P.S. § 1180–1 *et seq.* (Supp. 1975–76), claiming, *inter alia,* that he had been denied his rights relative to appeal. The PCHA hearing court determined that in fact this was the case, and he was therefore enabled to take an appeal as if timely filed. This appeal followed. In *Commonwealth v. Faison,* 437 Pa. 432, 264 A. 394 (1970), this Court laid down what I believe to be the proper test for determining whether an appellant on a *nunc pro tunc* appeal may raise an issue which is premised on a constitutional right announced subsequent to his judgment of sentence. We held that such an issue may be raised "provided that this right has been given such retroactive effect that it would have been available to appellant had an appeal been timely filed." 437 Pa. at 441, 264 A.2d at 399. Any other result would, as here, give such appellants an unfair windfall. The unfairness of granting appellant relief based on *Starkes* is made clear when it is considered that in *Commonwealth v. Moses,* 446 Pa. 350, 287 A.2d 131 (1971), we denied relief to a co-defendant of Webster's

who took a timely appeal. I believe that appellant's waiver of his rights and the voluntariness of his confession must be gauged by pre-*Starkes* law; and under that law I would find both voluntary.

For the aforementioned reasons, I dissent.