335 A.2d 698
**COMMONWEALTH of Pennsylvania**
**v.**
**Roddy STARKES, Appellant.**

Supreme Court of Pennsylvania.

Argued Jan. 18, 1974.

Decided March 18, 1975.

William R. Dimeling, Townsend, Elliott & Munson, Philadelphia, for appellant.

Arlen Specter, Dist. Atty., Richard A. Sprague, First Asst. Dist. Atty., David Richman, Asst. Dist. Atty., Chief, Appeals Div., J. T. Ranney, Philadelphia, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION

NIX, Justice.

In the instant case, the appellant, Roddy Starkes, seeks a reversal of the judgment of sentence on the ground that incriminating statements made by him to police offi-

cials were improperly introduced into evidence at his trial. After careful consideration of the record before us, we agree with this contention and hold that the judgment of sentence must be reversed and a new trial awarded.

Appellant and a co-defendant, Curtis Redmond, were arrested and charged with the robbery-murder of Mr. Edward Stradling which occurred on February 12, 1970, in the home of the victim. During the course of the robbery the deceased was struck with the butt of a butcher knife and stabbed in the back. Injuries sustained during the course of this attack resulted in his death. The appellant was tried and found guilty of murder in the first degree, aggravated robbery, burglary and conspiracy. Post-trial motions were filed and denied, and a sentence of life imprisonment was imposed on the murder bill of indictment. This direct appeal follows.[1]

On September 14, 1970, at approximately 2:20 P.M., the investigating officers arrived at the residence of the appellant. They advised appellant's mother that they were conducting an investigation concerning the death of Mr. Stradling and that her son was a suspect. At this time Starkes was fourteen years of age.

At the request of the officers, appellant was taken to the Homicide Unit for questioning. Appellant's mother had been advised that she would be permitted to accompany her son to Police Headquarters, but informed the officers she was unable to go at that time. However, she did state she intended to follow shortly thereafter. Appellant and the police officers arrived at Police Head-

1. Appeal from the judgment of sentence imposed on the murder charge before us is pursuant to the Appellate Court Jurisdiction Act, Act of July 31, 1970, P.L. 673, No. 223, art. II, § 202(1), 17 P.S. § 211.202(1) (Supp.1974–75). The appeal from the convictions under the other bills of indictment are before this Court pursuant to the Appellate Court Jurisdiction Act, Act of July 31, 1970, P.L. 673, No. 223, art. V, § 503(a), 17 P.S. § 211.503(a) (Supp.1974–75).

quarters at 3:15 P.M., and at 3:40 P.M., appellant was given the warnings mandated by *Miranda v. Arizona.*[2] The appellant responded to the warnings with monosyllabic responses. No further effort was made on the part of the police officers to determine the extent of Starkes' comprehension of these rights.[3] Custodial questioning then began and continued for a period of approximately one hour and twenty minutes, terminating at 5:00 P.M. During this initial period of questioning, appellant denied any knowledge of the incident.

At about 6:00 P.M., appellant's mother joined her son and remained alone with him for a period of time described by her as being "a pretty good while". During the course of the conversation with his mother, she encouraged him to tell the police officers the truth. It is significant to note that she had not been instructed as to the rights of an accused in a criminal case. A second interrogation session commenced at 8:07 P.M., during which appellant's first inculpatory statement was made at approximately 8:45 P.M. The first set of warnings given appellant in the presence of his mother was immediately prior to the commencement of the formal written statement at 12:47 A.M., the following morning.

Prior to trial, a motion to suppress this statement was filed asserting that there was not a knowing and voluntary waiver. After argument, the motion was

---

**2.** 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**3.** "But we are told that this boy was advised of his constitutional rights before he signed the confession and that, knowing them, he nevertheless confessed. That assumes, however, that a boy of fifteen, without aid of counsel, would have a full appreciation of that advice and that on the facts of this record he had a freedom of choice. We cannot indulge those assumptions. Moreover, we cannot give any weight to recitals which merely formalize constitutional requirements. Formulas of respect for constitutional safeguards cannot prevail over the facts of life which contradict them. They may not become a cloak for inquisitorial practices and make an empty form of the due process of law for which free men fought and died to obtain." *Haley v. Ohio,* 332 U.S. 596, 601, 68 S.Ct. 302, 304, 92 L.Ed. 224 (1948).

denied. The statement was introduced by the Commonwealth during the trial of the appellant. Objection to the introduction of the statement for the stated reason was again raised in support of post-trial motions, and, thus, has been properly preserved for appellate review.

■ The Commonwealth has the burden of proving, by a preponderance of the evidence, that the accused's confession was obtained after a knowing and intelligent waiver of his constitutional safeguards. *Commonwealth v. Goodwin,* 460 Pa. 516, 333 A.2d 892 (1975) (J–326 of 1974); *Commonwealth v. Ewell,* 456 Pa. 589, 319 A.2d 153 (1974); *Commonwealth v. Fogan,* 449 Pa. 552, 296 A.2d 755 (1972); *Commonwealth ex rel. Butler v. Rundle,* 429 Pa. 141, 239 A.2d 426 (1968).

Most recently, we observed in *Commonwealth v. Goodwin, supra,* that:

"The United States Supreme Court in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) stated that an individual under custodial interrogation, who has been informed properly of his privilege against self-incrimination and the right to counsel, may elect to waive these constitutional rights. However, the Court emphasized that any waiver must be knowing, intelligent and voluntary. *Miranda v. Arizona,* supra at 444, 86 S.Ct. 1602; *Commonwealth v. Purvis,* 458 Pa. 359, 326 A.2d 369 (1974); *Commonwealth v. Alston,* 456 Pa. 128, 317 A.2d 241 (1974); *Commonwealth v. Simms,* 455 Pa. 599, 317 A.2d 265 (1974); *Commonwealth v. Banks,* 454 Pa. 401, 311 A.2d 576 (1973); *Commonwealth v. Riggins,* 451 Pa. 519, 304 A.2d 473 (1973); *Commonwealth v. Eiland,* 450 Pa. 566, 301 A.2d 651 (1973); *Commonwealth v. Davenport,* 449 Pa. 263, 295 A.2d 596 (1972); *Commonwealth v. Koch,* 446 Pa. 469, 288 A.2d 791 (1972); and *Commonwealth ex rel. Butler v. Rundle,* 429 Pa. 141, 239 A.2d 426 (1968)." Id at 520–531, 333 A.2d at 894.

In determining the validity of an alleged waiver, we have ruled that it be the product of a free and uncoerced decision:

"The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. *Is the confession the product of an essentially free and unconstrained choice by its maker?* If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. *Rogers v. Richmond,* 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760. The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession." (Emphasis added). *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961).

See also, *Commonwealth v. Goodwin, supra,* and cases cited therein.

██ Further, in determining the voluntariness of the waiver, all attending factors and circumstances must be considered and evaluated:

" . . . [T]he duration, and the methods of interrogation; the conditions of detention, the manifest attitude of the police toward the defendant, the defendant's physical and psychological state and all other conditions present which may serve to drain one's powers of resistance to suggestion and undermine his self-determination. See *Culombe v. Connecticut,* supra [367 U.S.] at 602, [81 S.Ct. at 1860]; *Commonwealth ex rel. Butler v. Rundle,* supra [429 Pa.] at 151, 239 A.2d at 431; *Commonwealth v. Eiland,* supra [450 Pa.] at 574, 301 A.2d at 654; *Commonwealth v. Riggins,* supra [451 Pa. 519] at 525, 304 A.2d [473] at 476; *Commonwealth v. Banks,* supra [454 Pa.] at 407,

311 A.2d at 579. As we have noted, when the question of voluntariness passes beyond the realm of physical coercion and into degrees of psychological coercion, most careful attention will be afforded to any facts, circumstances or events tending to overbear the will of the accused. *Commonwealth ex rel. Butler v. Rundle*, supra [429 Pa.] at 149, 239 A.2d at 430." *Commonwealth v. Alston*, 456 Pa. 128, 134, 317 A.2d 241, 244 (1974).

See also *Commonwealth v. Goodwin, supra.*

In addition, we have recognized that where the accused is a child of tender years closer scrutiny must be given in determining the adequacy of the waiver.

" . . . [T]hat where the person involved is of tender years, the attending circumstances must be scrutinized with special care before an intelligent and knowing waiver is declared." *Commonwealth v. Fogan, supra*; 449 Pa. at 558, 296 A.2d at 758.

See also, *Commonwealth v. Jones,* —— Pa. ——, 315 A.2d 280 (1974) (J–355 of 1973); *Commonwealth v. Porter*, 449 Pa. 153, 295 A.2d 311 (1972) ; *Commonwealth v. Moses*, 446 Pa. 350, 287 A.2d 131 (1971); *Commonwealth v. Darden*, 441 Pa. 41, 271 A.2d 257 (1970), cert. denied, 401 U.S. 1004, 91 S.Ct. 1243, 28 L.Ed.2d 540 (1971).

■ Specifics such as age, intelligence, mental and physical development of the minor suspect are relevant factors in a determination as to whether or not the admissions were the product of a free and unfettered will and made only after a full appreciation of the rights that protect him.

In *Commonwealth v. Roane,* 459 Pa. 389, 329 A.2d 286 (1974) we observed:

"An important factor in establishing that a juvenile's waiver of his constitutional rights was a knowing and intelligent one would be evidence that, before he made his decision to waive those rights, he had ac-

cess to the advice of a parent, attorney, or other adult who was primarily interested in his welfare." *Id.* at 393, 329 A.2d at 288.

See also *Commonwealth v. Jones, supra.*

In the same vein, the United States Supreme Court observed in *Gallegos v. Colorado,* 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962):

"[The juvenile defendant] cannot be compared with an adult in full possession of his senses and knowledgeable of the consequences of his admissions. He would have no way of knowing what the consequences of his confession were without advice as to his rights —from someone concerned with securing him those rights—and without the aid of more mature judgment as to the steps he should take in the predicament in which he found himself. A lawyer or an adult relative or friend could have given the petitioner the protection which his own immaturity could not. Adult advice would have put him on a less unequal footing with his interrogators. Without some adult advice against this inequality, a 14 year-old boy would not be able to know, let alone assert, such constitutional rights as he had. To allow this conviction to stand would, in effect, be to treat him as if he had no constitutional rights." *Id.* at 54–55, 82 S.Ct. at 1212.

The reasoning of these cases have suggested that the advisability of adult advice for minors accused of a crime is premised upon the recognition that their immaturity deprives them of the sober judgment possessed by the average adult. This reasoning necessarily assumes that the adult who is offering the advice is in fact knowledgeable of the rights of a person in the position of the accused. Where, however, the adult in fact is not conversant with the constitutional guarantees that surround a person accused of a crime, his or her presence not only fails to provide the assistance envisioned by the rationale of these decisions, but might actually frustrate that

which is sought to be achieved by having an adult present.

The testimony of the parent in this case is most illustrative of the point:

"Q. Mrs. Starkes, when you were down at the Police Administration Building, did you tell your son to tell the truth?

A. Yes.

Q. Did you want him to tell the truth?

A. I told him that's all I know. *I told him I didn't know whether I was saying the right thing or not but* —

BY THE COURT:

Q. No. He asked you a direct question. *Did you tell your son to tell the truth?*

A. *Yes.*" (Emphasis added).

The plight of a juvenile suspect was graphically depicted by Mr. Justice Douglas in the case of *Haley v. Ohio*, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948):

"Age 15 is a tender and difficult age for a boy of any race. He cannot be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens. This is the period of great instability which the crisis of adolescence produces. . . . But we cannot believe that a lad of tender years is a match for the police in such a contest. He needs counsel and support if he is not to become the victim first of fear, then of panic. He needs someone on whom to lean lest the overpowering presence of the law, as he knows it, crush him" *Id.* at 599–560, 68 S. Ct. at 304.

The Supreme Court further observed in *Gallegos v. Colorado, supra*:

"The prosecution says that the boy was advised of his right to counsel, but that he did not ask either for a

lawyer or for his parents. But a 14-year-old boy, no matter how sophisticated, is unlikely to have any conception of what will confront him when he is made accessible only to the police. That is to say, we deal with a person who is not equal to the police in knowledge and understanding of the consequences of the questions and answers being recorded and who is unable to know how to protect his own interests or how to get the benefits of his constitutional rights." *Id.* 370 U.S. at 54, 82 S.Ct. at 1212.

 Where an informed adult is present the inequality of the position of the accused and police is to some extent neutralized and due process satisfied. However, where the adult is ignorant of the constitutional rights that surround a suspect in a criminal case and exerts his or her influence upon the minor in reaching the decision, it is clear that due process is offended. An uninformed adult present during custodial interrogation presents an even greater liability. The minor in such a situation is given the illusion of protection, but is in fact forced to rely upon one who is incapable of providing the advice and counsel needed in such a situation.

Unless we require police officers to also advise parents, who are in the position to counsel minor suspects during custodial interrogation, we will not only fail to assure the full benefits sought to be attained by this type of counseling but we will also increase the likelihood that the suspect will be misinformed as to his rights.[4]

 Here the first incriminatory statements came only after the mother's entreaties that the young man "tell the truth . . . ." Regardless of how laudible the mother's motives, we cannot obscure the primary consideration as to whether the minor fully realized that he was not legally required to make any statements

4. See Standards for Juvenile and Family Courts, 49 (1966) (Children's Bureau, Department of Health, Education and Welfare).

which would tend to incriminate him or to respond to questions without the presence of counsel. Where a parent is present we must at least require that parent to be advised of the rights possessed by the minor suspect before that parent may be permitted to influence the decision which the minor must make. Whether the pressure to respond to police questioning flows from the overzealousness of the police or the unadvised entreaties of a well-intentioned parent, the result is equally offensive to our concept of due process and frustrates the protection sought to be provided by our Constitution.

We believe that such a requirement is fully consistent with the burden mandated by the *Miranda, supra,* decision.

"A heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel". *Id.* 384 U.S. at 475, 86 S.Ct. at 1628.

■■ On this record, the Commonwealth has failed to establish that the decision of the appellant to respond to police questioning was not substantially influenced by the uninformed entreaties of the mother. In view of her lack of awareness as to appellant's rights, it cannot be said that the choice was a knowing and intelligent one. Nor is the fact that she was subsequently advised of these rights immediately preceding the taking of the formal statement of any help to the position of the Commonwealth. At that point the incriminating statements had been made and the die had been cast.

Judgment of sentence is reversed and a new trial is awarded.

EAGEN, J., filed a dissenting opinion in which JONES, C. J., and POMEROY, J., join.

O'BRIEN, J., concurs in the result.

EAGEN, Justice (dissenting).

The proof at trial in this case established that the appellant Starkes and a fellow "gang" member entered into a plan to rob a forty-seven-year-old male in Philadelphia who was known for imbibing intoxicants too freely and too often. When Starkes and his companion arrived at the residence of their intended victim, they found him as expected, inebriated. In an effort to compel him to hand over any available money, the victim was beaten with the butt of a thirteen-inch butcher knife and when he failed to respond to these assaults, he was then stabbed in the back with the knife by Starkes. The blade of the knife penetrated the victim's body to a depth of seven inches causing a fatal wound. Starkes and his co-felon then searched the person of the victim, propped his body up against a wall, removed the phone from the hook and fled the scene.

Two days after the crimes, Starkes was taken into police custody and confessed. A majority of this Court now say this confession was constitutionally invalid *as a matter of law* because Starkes' mother, who admittedly was with him and counseling him at all times relevant to the confession, was not advised by the police of her son's constitutional rights, including his right to remain silent.

I cannot subscribe to this position. An individual's constitutional rights are a personal matter and the crucial issue in this and similar cases is whether the maker of the confession (herein Starkes) fully understood his rights and waived them knowingly and intelligently. It is not disputed that Starkes was personally fully warned of his rights and said he understood them. In my view, whether he did and then effectively waived these rights was an issue of fact. Two evidentiary hearings on this issue transpired in the trial court, first before a judge on the motion to suppress and then before a trial jury of twelve citizens. In both instances, the triers of fact found Starkes knew his rights and knowlingly and intel-

ligently waived them before he confessed. I am not persuaded these findings should be overruled.

I dissent.

JONES, C. J., and POMEROY, J., join in this dissenting opinion.