402 A.2d 1360

COMMONWEALTH of Pennsylvania

v.

Gordon I. WADE, Appellant.

Supreme Court of Pennsylvania.

Argued March 13, 1979.

Decided July 6, 1979.

454

Judgment of sentence reversed and new trial granted.

Richard H. Martin, Pittsburgh, for appellant.

Robert E. Colville, Dist. Atty., Robert L. Eberhardt, Charles W. Johns, Kathryn Lease Simpson, Asst. Dist. Attys., Pittsburgh, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, NIX, MANDERINO and LARSEN, JJ.

## OPINION OF THE COURT

O'BRIEN, Justice.

Appellant, Gordon I. Wade, was convicted of murder of the first degree for the strangulation slaying of Donna Murphy. Post-verdict motions were denied and appellant was sentenced to life imprisonment. This direct appeal followed.

Appellant first claims that the trial court erred in refusing to discharge him because of the Commonwealth's alleged noncompliance with Pa.R.Crim.P. 1100. We do not agree.

Appellant was arrested on December 16, 1976, with the one hundred eighty day period called for in Rule 1100 expiring on June 14, 1977. Trial was originally scheduled to commence on April 18, 1977. On April 5, 1977, appellant filed an application for continuance, alleging that further medical and psychological testing was necessary to prepare his defense. The application was granted and a new trial date of July 11, 1977, was set.

On April 6, 1977, the Commonwealth petitioned for an extension of time, alleging that despite all due diligence, the Commonwealth would be unable to try appellant by June 14, 1977. On April 19, 1977, the court below granted the Commonwealth's petition, setting the trial date at July 11, 1977, but not later than September 12, 1977.

On July 11, 1977, a hearing was held on appellant's motion to suppress. On July 14, 1977, the Commonwealth sought to have appellant committed to Mayview for psychological examination. Appellant agreed to the commitment, but objected to any postponement of his trial. He was committed to Mayview State Hospital for a period not to exceed sixty days for further psychological testing.

The Commonwealth, on July 15, 1977, filed a second petition to extend time, which was granted, with trial set for September 12, 1977, but not later than October 17, 1977. Prior to commencement of trial on September 12, appellant orally moved for a dismissal of the charges because of an alleged violation of Rule 1100. The trial court denied the motion and the case proceeded to trial.

We believe appellant was properly tried in accordance with Rule 1100. As a portion of the rule states:

"At any time prior to the expiration of the period for commencement of trial, the attorney for the Commonwealth may apply to the court for an order extending the time for commencement of trial. A copy of such application shall be served upon the defendant through his attorney, if any, and the defendant shall also have the right to be heard thereon. Such application shall be granted only if trial cannot be commenced within the prescribed period despite due diligence by the Commonwealth. *Any order granting such application shall specify the date or period within which trial shall be commenced.*" Pa.R.Crim.P. 1100(c) (Emphasis added.)

In the instant case, the Commonwealth, on April 6, filed a petition for extension of time, alleging that despite all due diligence, appellant would not be tried within the 180-day period prescribed by Rule 1100. The court below agreed with the Commonwealth and ordered that trial be held on July 11, 1977, but not later than September 12, 1977. Appellant's trial did, in fact, commence on September 12. Thus, if the court properly granted the Commonwealth's petition for extension of time, appellant was tried in compliance with Rule 1100.

■ In its petition to extend time, the Commonwealth cited appellant's continuance which was granted until July 11, 1977, as the reason for being unable to try appellant within the 180-day period. After the continuance was granted, it was impossible to bring appellant to trial within 180 days, so the court below properly granted the petition for extension of time. In the order, the court held that trial was to commence "no later than September 12, 1977." As appellant's trial was commenced within the time called for in the order extending time for trial, we find no violation of appellant's Rule 1100 rights.

Appellant next challenges the proceedings whereby the court below refused to certify that appellant should be tried as a juvenile. Appellant's attack is three-pronged. He first argues that the Juvenile Act,[1] by excluding the crime of murder from the original jurisdiction of juvenile court, violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. He further contends that the act, by failing to include adequate standards as to when a juvenile murder case may be transferred to juvenile court, denies him due process under the Fourteenth Amendment. Appellant finally argues that he presented sufficient evidence to require the court to transfer the case to juvenile court. We find no merit in any of these arguments.

The applicable sections of the Juvenile Act provide: "§ 50–303:

"If it appears to the court in a criminal proceeding other than murder, that the defendant is a child, this act shall immediately become applicable, and the judge shall forthwith halt further criminal proceedings, and, where appropriate, transfer the case to the Family Court Division or to a judge of the court assigned to conduct juvenile hearings, together with a copy of the accusatory pleading and other papers, documents, and transcripts of testimony relating to the case. If it appears to the court in a criminal proceeding

1. Act of December 6, 1972, P.L. 1464, No. 333 §§ 1, et seq., 11 P.S. §§ 50–101, et seq. (Supp.1978–79).

charging murder, that the defendant is a child, the case may similarly be transferred and the provisions of this act applied. The defendant shall be taken forthwith to the probation officer or to a place of detention designated by the court or released to the custody of his parent, guardian, custodian, or other person legally responsible for him, to be brought before the court at a time to be designated. The accusatory pleading may serve in lieu of a petition otherwise required by this act, unless the court directs the filing of a petition.

"If in a criminal proceeding charging murder the child is convicted of a crime less than murder, the case may be transferred to the Family Court Division or to a judge assigned to conduct juvenile hearings for disposition." Act of December 6, 1972, P.L. 1464, § 7, 11 P.S. § 50–303 (Supp.1978–79).

"§ 50–325:

"(a) After a petition has been filed alleging delinquency based on conduct which is designated a crime or public offense under the laws, including local ordinances, of this State, the court before hearing the petition on its merits may rule that this act is not applicable and that the offense should be prosecuted, and transfer the offense, where appropriate, to the trial or criminal division or to a judge of the court assigned to conduct criminal proceedings, for prosecution of the offense if:

"(1) The child was fourteen or more years of age at the time of the alleged conduct; and

"(2) A hearing on whether the transfer should be made is held in conformity with this act; and

"(3) Notice in writing of the time, place, and purpose of the hearing is given to the child and his parents, guardian, or other custodian at least three days before the hearing; and

"(4) The court finds that there is a prima facie case that the child committed the delinquent act alleged, and the court finds that there are reasonable grounds to believe that: (i) the child is not amenable to treatment, supervision

or rehabilitation as a juvenile through available facilities, in determining this the court may consider age, mental capacity, maturity, previous record and probation or institutional reports; and (ii) the child is not committable to an institution for the mentally retarded or mentally ill; and (iii) the interests of the community require that the child be placed under legal restraint or discipline or that the offense is one which would carry a sentence of more than three years if committed as an adult.

"(b) The transfer terminates the applicability of this act over the child with respect to the delinquent acts alleged in the petition.

"(c) The child may request that the case be transferred for prosecution in which event the court may order this act not applicable.

"(d) No hearing shall be conducted where this act becomes applicable because of a previous determination by the court in a criminal proceeding.

"(e) Where the petition alleges conduct which if proven would constitute murder, the court shall require the offense to be prosecuted under the criminal law and procedures except where the case has been transferred from the criminal court pursuant to section 7 of this act.

"(f) The decision of the court to transfer or not to transfer the case shall be interlocutory." Act of December 6, 1972, P.L. 1464, § 28, 11 P.S. § 50–325 (Supp.1978–79).

Since appellant was charged with murder, his case originated in the Criminal Division of the Court of Common Pleas of Allegheny County. However, appellant filed a timely application to transfer his case to juvenile court. The application for transfer alleged that:

"1. The defendant's status as a juvenile requires, in the interests of the defendant, his family and society in general, that he be shielded from publicity.

"2. The defendant's medical and psychiatric condition require that, if convicted, he not be confined to custody along with adults and that he be given adequate opportunity for medical and psychiatric treatment.

"3. The defendant's civil rights be preserved, as well as the protection against the use of adjudication against him in subsequent proceedings; and

"4. That defendant be protected against disqualification for public and private employment."

An evidentiary hearing on the application to transfer was held pursuant to the requirements of the Juvenile Act. Appellant introduced four exhibits: (1) the newspaper publicity on the case; (2) various psychiatric evaluations of appellant; (3) appellant's records from Schenley High School; and (4) appellant's educational and psychological records from Falk School. Further, appellant's father, Isaac Wade, Vice Principal of Allegheny High School and Administrator of the Occupational, Vocational and Technical Education Section, testified in his son's behalf. He testified that as part of his job, he had been required to evaluate various juvenile institutions in the Commonwealth and their ability to deal with juvenile behavioral problems. Mr. Wade testified that in his opinion, appellant was amenable to treatment as a juvenile and would better benefit from confinement in an institution such as George Junior Republic than being placed in an adult correctional institution. The Commonwealth presented no evidence. The court, however, refused the application to transfer and held that appellant must be tried as an adult.

Appellant first argues that by excluding murder from the original jurisdiction of juvenile court, the Juvenile Act denies appellant equal protection as guaranteed by the Fourteenth Amendment to the United States Constitution. As the Juvenile Act states:

" 'Delinquent act' means an act designated a crime under the law of this State, or of another state if the act occurred in that state, or under Federal law, or under local ordinances. . . . *'Delinquent act' shall not include the crime of murder* . . . ." Act of December 6, 1972, P.L. 1464, No. 333, § 2, 11 P.S. § 50–102(2) (Supp.1978–79). (Emphasis supplied.)

As the United States Supreme Court stated in *Reed v. Reed*, 404 U.S. 71, 75–6, 92 S.Ct. 251, 253–254, 30 L.Ed.2d 225 (1971):

"In applying [the equal protection] clause, this Court has consistently recognized that the Fourteenth Amendment does not deny to States the power to treat different classes of persons in different ways. *Barbier v. Connolly*, 113 U.S. 27, 5 S.Ct. 357, 28 L.Ed. 923 (1885); *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369 (1911); *Railway Express Agency v. New York*, 336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533 (1949); *McDonald v. Board of Election Commissioners*, 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969). The Equal Protection Clause of that amendment does, however, deny to States the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute. A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' *Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989 (1920)."

The question thus presented is whether excluding the crime of murder from the original jurisdiction of Juvenile Court bears a rational relationship to the legislative objective sought to be advanced by the Juvenile Act. As the act itself states:

"(b) This act shall be interpreted and construed as to effectuate the following purposes:

"(1) To preserve the unity of the family whenever possible and to provide for the care, protection, and wholesome mental and physical development of children coming within the provisions of this act;

"(2) *Consistent with the protection of the public interest*, to remove from children committing delinquent acts the consequences of criminal behavior, and to substitute therefor a program of supervision, care and rehabilitation;

"(3) To achieve the foregoing purposes in a family environment whenever possible, *separating the child from parents only when necessary for his welfare or in the interests of public safety*;

"(4) To provide means through which the provisions of this act are executed and enforced and in which the parties are assured a fair hearing and their constitutional and other legal rights recognized and enforced." *Id.*, § 1, 11 P.S. § 50–101. (Emphasis added.)

Appellant correctly observes that the Juvenile Act's main purpose is the rehabilitation of juvenile offenders. Appellant fails to note, however, that the act also specifically provides for protection of both the public interest and the public safety. In *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802, 809, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739 (1969), the court stated:

"Legislatures are presumed to have acted constitutionally even if source materials normally resorted to for ascertaining their grounds for action are otherwise silent, and their statutory classifications will be set aside only if no grounds can be conceived to justify them."

■ Under the Juvenile Act, the Legislature had decided that the crime of murder, whether committed by an adult or a juvenile, is of such a serious nature as to originally exclude an alleged juvenile murderer from the benefits and special treatment afforded by the act. As the Juvenile Act forbids incarceration of juveniles for a period of longer than three years, 11 P.S. § 50–323(a), the Crimes Code mandates a life sentence upon conviction of murder of either the first or second degree, 18 Pa.C.S.A. § 1102. In light of the disparity in sentencing procedures and while trying to protect the public safety, the Legislature excluded the crime of murder from the jurisdiction of juvenile court. We do not believe the classification is arbitrary and further believe that the classification bears a rational relationship to the objectives espoused by the Juvenile Act.

Appellant further argues that the Juvenile Act denies equal protection because there is no assurance that the

jurisdictional provision will be equally administered. Appellant argues that the statute allows for significant prosecutorial discretion in determining whether to charge a youthful offender with either murder or unlawful killing,[2] thus allowing a prosecutor to invoke the jurisdiction of either criminal or juvenile court.

As the United States Supreme Court stated, however, in *Queenside Hills Co. v. Saxl*, 328 U.S. 80, 84–5, 66 S.Ct. 850, 852, 90 L.Ed. 1096 (1946): " . . . The . . . lack of equal protection is found in the actual existence of an invidious discrimination, *not in the mere possibility that there will be like or similar cases which will be treated more leniently.*" (Citations omitted.) (Emphasis added.) Instantly, appellant is able to point to no actual discrimination, and as such, his equal protection claim based on possibilities must fail. See also *Commonwealth v. Lewis*, 443 Pa. 305, 279 A.2d 26 (1971).

Appellant next argues that the Juvenile Act denies him due process of law as guaranteed by the Fourteenth Amendment and set forth in *Kent v. United States*, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966). In *Kent* and *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), the Supreme Court decided that juvenile waiver proceedings (transfer of a case from the juvenile to the adult court system) were a critically important stage to which due process safeguards attached. Due process requires (1) that a juvenile offender is entitled to a hearing; (2) that the juvenile is entitled to representation by counsel; (3) that the juvenile offender be given access to his social records and (4) that the juvenile is entitled to a statement of reasons behind the order transferring the case to adult court. Appellant believes that the Juvenile Act fails to provide adequate standards by which a court is to determine whether a juvenile charged with murder should be transferred to Juvenile Court. Appellant believes that this failure amounts to a denial of due process. Finding that adequate standards to exist, we find no merit in appellant's argument.

2. Voluntary manslaughter and involuntary manslaughter, while amounting to unlawful killings, do not rise to the level of murder.

In *Commonwealth v. Pyle,* 462 Pa. 613, 342 A.2d 101 (1975), we discussed the applicable transfer provisions of the Juvenile Act. As the act specifically provides for transfer of juvenile defendants to Criminal Court, 11 P.S. 50–325, we held those standards were also applicable upon a motion to transfer a juvenile charged with murder to juvenile court. Specifically, a juvenile charged with murder who wishes his case transferred to juvenile court must show that such offender is amenable to treatment through the juvenile facilities, taking into account "age, mental capacity, maturity, previous record and probation or institutional reports." 11 P.S. § 50–325(a)(4)(i). As the act does provide standards by which a petition to transfer is to be judged, we believe appellant's due process claim is meritless.

Appellant argues, however, that the trial court which denied his transfer motion failed to comply with that portion of the mandate of *Kent v. United States, supra,* which requires the court to give a statement of reasons justifying its decision. We believe, however, that appellant has misperceived that portion of *Kent.* As the court stated:

"Meaningful review requires that the reviewing court should review. It should not be remitted to assumptions. It must have before it a statement of the reasons motivating the waiver including, of course, a statement of the relevant facts. It may not 'assume' that there are adequate reasons, nor may it merely assume that 'full investigation' has been made. Accordingly, we hold that it is incumbent upon the Juvenile Court to accompany its waiver order with a statement of the reasons or considerations therefor. We do not read the statute as requiring that this statement must be formal or that it should necessarily include conventional findings of fact. But the statement should be sufficient to demonstrate that the statutory requirement of 'full investigation' has been met; and that the question has received the careful consideration of the Juvenile Court; and it must set forth the basis for the order with sufficient specificity to permit meaningful review." *Kent v. United States, supra,* 383 U.S. at 561, 86 S.Ct. at 1057.

While the trial court did not set forth any written reasons for refusing the petition for transfer at the time that decision was made, the following was contained in the trial court's opinion denying appellant's post-verdict motions:

". . . In the present case the record is complete. There is testimony, school records and psychiatric evaluations. The appellate court will have available to it all of the information that was available to the trial court and upon which it based its determination. The Court finds that the purpose for which the written statement is required has been accomplished and the defendant has not been denied his due process rights."

Further:

". . . At the hearing on defendant's Application to Transfer, defense counsel presented psychiatric evaluations of the defendant, the defendant's high school records, his grade school records which included psychological and behavioral data and the testimony of the defendant's father who as the Administrator the Occupational, Vocational and Technical Education Section of Allegheny High School has dealt with juveniles who had been sentenced to various juvenile institutions around the state. Furthermore, since the Suppression Hearing preceded the hearing on the transfer application, the Court was fully informed as to the facts of the case. The Court was cognizant of and the record reflected that the defendant was 15½ years of age, he had not been designated as either mentally ill or retarded, the defendant could be imprisoned for more than three years as a result of his crime and the victim was a teenage friend and neighbor of the defendant. From these and other facts available to it, the Court determined that the interest and safety of the community required that the defendant be restrained and treated as an adult."

In light of the preceding quotes, we do not believe appellant was denied any due process rights by the court's failure to give written reasons for denying the transfer application at the time the decision was made.

Appellant next claims that the court erred in refusing his application for transfer to juvenile court. He believes he presented sufficient evidence showing that he was amenable to treatment as a juvenile and that evidence was not contradicted by the Commonwealth, which presented no evidence at the hearing.[3] Appellant thus believes the court was obligated to grant his application for transfer. We disagree.

In *Commonwealth v. Pyle, supra,* we held that subject to the due process limitations of *Kent v. United States, supra,* and *In re Gault, supra,* a decision whether to grant an application filed by either the Commonwealth or a defendant is within the sound discretion of the hearing judge. As this court stated in *Garrett's Estate,* 335 Pa. 287, 293, 6 A.2d 858, 860 (1939):

". . . An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused." (Citations omitted.)

Using this standard, we do not believe the trial court abused its discretion in denying appellant's application to transfer his case to juvenile court.

As the trial court stated:

". . . At the hearing on defendant's Application to Transfer, defense counsel presented psychiatric evaluations of the defendant, the defendant's high school records, his grade school records which included psychological and behavioral data and the testimony of the defendant's father who as the Administrator of the Occupational, Vocational and Technical Education Section of Allegheny High School has dealt with juveniles who had been sentenced to various juvenile institutions around the state. Furthermore, since the Suppression Hearing preceded the hearing on the trans-

---

**3.** The Commonwealth, of course, has no burden of proof in cases where a juvenile charged with murder is attempting to have his or her case transferred to juvenile court. *Commonwealth v. Pyle, supra,* n.13.

fer application, the Court was fully informed as to the facts of the case. The court was cognizant of and the record reflected that the defendant was 15½ years of age, he had not been designated as either mentally ill or retarded, the defendant could be imprisoned for more than three years as a result of his crime and the victim was a teenage friend and neighbor of the defendant. From these and other facts available to it, the Court determined that the interest and safety of the community required that the defendant be restrained and treated as an adult."

In the instant case, the trial court considered all the factors called for in § 28 of the Juvenile Act. Implicit in the trial court's refusal to transfer is a finding that appellant failed to prove that the benefits of treatment as a juvenile outweighed society's interest and safety in trying and possibly restraining appellant as an adult. We can find no abuse of discretion by the trial court and thus we will not disturb the court's ruling that appellant should be tried in criminal court.

Appellant finally argues that the court below erred when it refused to suppress his confession. Appellant believes that the Commonwealth failed to establish a knowing and intelligent waiver of appellant's constitutional rights. The facts are as follows.

At the time of his arrest, appellant was fifteen years old. Police had asked appellant's father to take appellant and his brother to the Public Safety Building for an interview. Neither brother was a suspect; the police simply wished to talk to them as they had discovered the victim's body.

The original interview by Detective Ronald Freeman was conducted in the presence of appellant's father. Since appellant was not a suspect, no warnings were given prior to the interview. During the course of the interview, appellant's father left the interview room to ascertain the whereabouts of appellant's brother. While Mr. Wade was out of the room, appellant made a few statements which convinced Detective Freeman that appellant should be treated as a suspect. Freeman immediately stopped the interview.

Freeman left appellant alone in the interview room and went across the hall to talk with Mr. Wade. Freeman informed Mr. Wade of the rights available to his son. After determining that Mr. Wade understood his son's rights, Freeman and Mr. Wade returned to the interview room where appellant was waiting. In a short conversation lasting only a few minutes, Mr. Wade, in the presence of Detective Freeman, advised appellant to tell the truth. Mr. Wade then left the room.

Detective Freeman then informed appellant of his constitutional rights. *The record, however, contains no indication that appellant either affirmatively stated that he understood the Miranda warnings or that he affirmatively waived those rights.*[4] Appellant then asked Freeman to promise not to tell Mr. Wade certain items which appellant wished to keep from his father. Freeman said he was unable to make such a promise. The officer then left the interview room to relay appellant's request to his father. Mr. Wade told Freeman to tell appellant that all the facts would come out in court. Freeman then returned to the interview room and relayed Mr. Wade's message to appellant. Appellant then admitted killing Murphy. Freeman asked appellant if he would give a taped confession. Appellant was unwilling to use a tape recorder, but told Freeman he would write out the confession in longhand. Freeman left appellant alone in the interview room and appellant wrote out a statement in his own handwriting, confessing to the crime.

Appellant argues that the Commonwealth failed to establish that he waived his rights guaranteed by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In *Commonwealth v. Smith*, 472 Pa. 492, 372 A.2d 797 (1977), we stated:

4. *North Carolina v. Butler*, —— U.S. ——, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979) does not compel a different result. The United States Supreme Court in *Butler* interpreted *Miranda* to allow an implicit waiver of rights where a criminal defendant understands those rights and then exhibits a course of conduct which would indicate an implicit waiver. The instant record contains no evidence that appellant understood and/or waived his *Miranda* rights.

". . . In our view, due process requires that a waiver by a youthful offender is effectuated only when it has been shown that the minor *comprehended* the full significance of the panoply of rights that protects him during custodial interrogation. We have insisted the Commonwealth bear the burden of proving a knowing waiver." (Emphasis in original.)

■ Here, we need not determine whether appellant was afforded an opportunity for consultation with an interested and informed adult. Such analysis is required to determine if a waiver of rights *by the juvenile defendant* is knowing and intelligent. The instant record contains no indication that appellant effectively waived his applicable rights. As the Commonwealth has not met its burden of showing such a waiver, appellant's statement must be suppressed.

Judgment of sentence reversed and new trial granted.

ROBERTS, J., files a concurring opinion which MANDERINO, J., joins.

NIX, J., files a concurring opinion.

EAGEN, C. J., concurs in the result.

LARSEN, J., dissents.

ROBERTS, Justice, concurring.

I agree with the majority that because the Commonwealth failed to establish that appellant voluntarily and knowingly waived his *Miranda* rights, appellant's statement was inadmissible. I agree also that *North Carolina v. Butler,* —— U.S. ——, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979) does not compel a different result. As a matter of state law, this Court need not, and should not follow *Butler.* I therefore join in the majority's mandate reversing judgment of sentence and granting appellant a new trial.

I disagree, however, with the conclusion of the majority that the trial court's denial of appellant's motion to transfer his case to the jurisdiction of the juvenile court was proper. The court did not set forth its reasons for denying appel-

lant's motion with sufficient specificity to afford meaningful appellate review of its decision. We should, therefore, require that on remand, another, and more complete certification hearing be held and a new decision rendered in conformity with *Kent v. United States*, 383 U.S. 541, 561, 86 S.Ct. 1045, 1057, 16 L.Ed. 84 (1966); *Commonwealth v. Pyle*, 462 Pa. 613, 342 A.2d 101 (1975); *Commonwealth v. Harrod*, —— Pa.Super. ——, 394 A.2d 567 (1978), and *Commonwealth v. Bey*, 249 Pa.Super. 185, 375 A.2d 1034 (1977).

MANDERINO, J., joins in this concurring opinion.

NIX, Justice, concurring.

I agree with today's majority opinion awarding a new trial for the appellant. Unlike the majority, I would rest this conclusion upon a finding that the record fails to support an effective waiver by a juvenile suspect. *Commonwealth v. McCutchen*, 463 Pa. 90, 343 A.2d 669 (1970).[1]

Appellant was fifteen years old when he was interrogated at a police station regarding the murder with which he was later charged. Although he was apparently advised of his *Miranda* rights, this Court has said:

[T]he administering of *Miranda* warnings to a juvenile, without providing an opportunity to that juvenile to consult with a mature, informed individual concerned primarily with the interest of the juvenile, was inadequate to offset the disadvantage occasioned by his youth. The new rule appreciates that the inexperience of the minor affects not only his or her ability to understand the full implication and consequences of the predicament but also renders the judgment inadequate to assess the spectrum of consideration encompassed in the waiver decision. It was therefore reasoned that the impediment of immaturity can only be overcome where the record establishes that the youth had access to the advice of an attorney, parent, or other

---

1. In view of my approach to this case, there is no occasion for me to discuss the applicability or the soundness of the recent U.S. Supreme Court decision in *North Carolina v. Butler*, —— U.S. ——, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979.)

interested adult and that the consulted adult was informed as to the constitutional rights available to the minor and aware of the consequences that might follow the election to be made.

*Commonwealth v. Smith*, 472 Pa. 492, 498–99, 372 A.2d 797, 800 (1977) (footnote omitted).

*Accord, Commonwealth v. Barnes*, 482 Pa. 555, 394 A.2d 461 (1978); *Commonwealth v. Lawson*, 478 Pa. 200, 386 A.2d 509 (1978); *Commonwealth v. Lee*, 475 Pa. 314, 380 A.2d 371 (1977); *Commonwealth v. Jamison*, 474 Pa. 541, 379 A.2d 87 (1977); *Commonwealth v. Graver*, 473 Pa. 473, 375 A.2d 339 (1977); *Commonwealth v. Harvell*, 473 Pa. 418, 374 A.2d 1282 (1977); *Commonwealth v. Gaskins*, 471 Pa. 238, 369 A.2d 1285 (1977); *Commonwealth v. Lee*, 470 Pa. 401, 368 A.2d 690 (1977); *Commonwealth v. Hailey*, 470 Pa. 488, 368 A.2d 1261 (1977); *Commonwealth v. Webster*, 466 Pa. 314, 353 A.2d 372 (1976); *Commonwealth v. Stanton*, 466 Pa. 143, 351 A.2d 663 (1976); *Commonwealth v. Chaney*, 465 Pa. 407, 350 A.2d 829 (1975); *Commonwealth v. Smith*, 465 Pa. 310, 350 A.2d 410 (1976); *Commonwealth v. Riggs*, 465 Pa. 208, 348 A.2d 429 (1975); *Commonwealth v. McCutchen, supra, Commonwealth v. Starkes*, 461 Pa. 178, 335 A.2d 698 (1975); *Commonwealth v. Roane*, 459 Pa. 389, 329 A.2d 286 (1974).

It is also clear that the primary aim of the *McCutchen* rule is to provide the juvenile suspect with an adult who is sensitive to the juvenile's legal position and concerned with advising the youth as to his best interests under the circumstances. This responsibility is not discharged merely by the adult instructing the juvenile to "tell the truth to the police." This is so even where the advice is supplied by a parent. As the Court stated in the *Smith* case:

It was never the intention to exclude the requirement of interest simply because the consulting adult was a parent of the minor. To the contrary, it was assumed that the relationship would assure the requisite concern for the welfare of the minor. However, that assumption does not justify the creation of an irrebuttable presumption of interest by a parent. Where, as here, the disinterest of

the parent is graphically demonstrated, it is clear that [the father] was not the interested adult envisioned in the rule. If the adult is one who is not concerned with the interest of the minor, the protection sought to be afforded is illusory and the procedure fails to accomplish its purpose of offsetting the disadvantage occasioned by the immaturity.

*Commonwealth v. Smith,* 472 Pa. at 500, 372 A.2d at 801 (footnote omitted).

In the present case the record reveals that appellant's father "was not the interested adult envisioned in the rule." *Id.* The detective who elicited appellant's confession testified that there was a clear "conflict" between the father and appellant, so great that "the two wouldn't come together physically except for a small period of time." The detective further testified that "it was so obvious that there was something between the father and the son, it wasn't a normal father and son relationship . . .. [H]is father wouldn't go in the room with the kid. I mean I couldn't understand it."

Appellant's father was not in the same room with appellant during the interrogation. The detective was forced to shuttle back and forth between the interrogation room and the room where appellant's father was throughout the questioning. The detective testified to the following sequence of events. At 7:28, when appellant was advised of his constitutional rights by the detective, appellant's father was not present. The detective left appellant at 7:39 and advised the father that appellant was a suspect. At 7:41, appellant's father returned with the detective and told appellant to tell the truth. This instruction was given by the father to his son, without any attempt to ascertain his son's version of the events and without ascertaining in what manner the son might be implicated by discussing the case at this point. Appellant's father then again left his son alone with the detective. Appellant told the detective there were things he didn't want his father to know and tried to get the detective

to promise not to tell him. At 7:48, the detective left the room and told appellant's father that his son didn't want him to know certain things. The father replied by saying that it would all come out in court anyway. The detective returned to the interrogation room at 7:51 and continued his questioning. At 7:54, he left the room and asked appellant's father if appellant would cover up for someone, to which the father replied either "no" or that he didn't know. At 7:56, the detective returned to the interrogation room, and, during his questioning, appellant orally admitted to committing the murder. The detective left the room at 8:06 and told the father that appellant had confessed. Upon the detective's return to the interrogation room at 8:15, he found appellant writing a poem on a piece of paper. The detective asked him to write his version of the murder, to which appellant agreed. The detective again left the room and when he returned, appellant had written out his confession. This confession was later entered against him.

The detective's testimony clearly shows that appellant's father was insufficiently interested in appellant's legal interests and that appellant was denied the kind of consultation with an adult that is a prerequisite to a valid waiver of *Miranda* rights. It is difficult to understand how the juvenile's rights could be properly safeguarded by an adult who refused to be in the same room with the juvenile during the interrogation and where the rapport between the two was obviously strained. *While it is always an appropriate admonition to tell the truth to one who has made an informed decision to give a statement, that was not the question that the consultation was designed to consider. Rather, the question was the advisability of the accused's participation in a custodial interrogation.* It is clear that the father in this instance made no attempt to seek from his son the necessary information required to make an intelligent judgment as to this question. Absent such information, he was clearly not equipped to provide the guidance that the rule envisions.