451 A.2d 1019
**COMMONWEALTH of Pennsylvania**
v.
**Donald HILL, Appellant.**
Superior Court of Pennsylvania.
Submitted April 23, 1982.
Filed Oct. 15, 1982.
Petition for Allowance of Appeal Denied Feb. 7, 1983.

Elaine DeMasse, Assistant Public Defender, Philadelphia, for appellant.

Jane C. Greenspan, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

Before WICKERSHAM, BROSKY and WIEAND, JJ.

WICKERSHAM, Judge:

On September 22, 1981 an adjudicatory hearing was held before the Honorable Paul A. Tranchitella in the Court of

Common Pleas of Philadelphia, Family Division-Juvenile Branch, in the matter of Donald Hill.

Detective Domenic Bellizzie testified at the hearing that on July 8, 1981 he took Donald Hill and three other young males into custody, gave them their constitutional warnings and held them in the juvenile aid holding room. He testified:

Q. Detective, did you fully explain the defendant's constitutional rights to him at this time?

A. Yes, I did.

Q. Did you know the age of the defendant?

A. Seventeen years old.

Q. Did you attempt to contact a parent or parents of the defendant?

A. We contacted the defendant's mother.

Q. How did you do that?

A. By phone.

Q. Did you ask his mother to come down to Northwest?

A. Yes, I did.

Q. What was her answer to you?

A. She was unable to get there at that time, Your Honor. I then read her the boy's rights over the phone.

I explained to her the charges, had the boy speak to his mother, at which time I talked to her and she said it was all right for him to give a statement to me.

Q. After talking to the mother and giving her the warnings, did you ask this defendant and question him as to his understanding of his rights?

A. Yes.

Q. Did he have an opportunity to have something to eat or drink during that time?

A. I think he went to the men's room and he had a drink, I believe. I am not positive.

Q. Did you take a statement?

A. Yes, I did.

Q. Did you ever speak to the defendant's mother after you had taken the statement?

A. Yes, I did.

Q. Will you tell us how and where?

A. After the statement was taken, approximately forty-five minutes to an hour after that—I guess that would be around 6:30 p.m., the boy's mother and father did come in, at which time I read the statement to them and they had no objections to it at that time.

Q. Detective, you did say that the defendant talked to his mother on the phone?

A. Yes, he did.

Q. Do you know how long that conversation lasted; if you recall?

A. No, I don't recall.

. . . .

Q. Detective, what time did you take this young man into custody?

A. 1:45 p.m.

Q. This young man was not taken into custody on this case; is that correct?

A. That is correct.

Q. Were you the detective who actually made the arrest?

A. I was there when the arrest was made of this male. I arrested another male at that time.

Q. What time did this young man get into the police district?

A. A short time after that, he was transported in.

Q. Approximately what time would he have arrived in the JAD office?

A. 2:15 p.m.

Q. Officer, what time did you begin the questioning?

A. After numerous attempts to get his mother, the questioning was begun at—the warnings were given at 5

o'clock p.m. and the question[ing] started a short time after that.

Record at 5–7.

Charles Anderson testified at the same hearing and advised the court that he lived at 4718 North Ninth Street, Philadelphia, and that he left his home on March 23, 1981 at about 6:00 in the morning and returned at 3:20 that afternoon.

Q. Tell us what you found when you got back home.

A. I came through the front door, and I discovered that my stereo equipment had been gone.

Q. What else, if anything, was missing?

A. A pocket watch, a rifle and two cameras.

Q. Can you tell us the approximate value of everything that was taken?

A. About a thousand, five hundred dollars.

Q. After you found the items missing, did you look at the house?

A. Yes, I did.

Q. Tell us about the doors?

A. The storm door had been jimmied, and the window on the door itself had been broken.

Q. When you had left that day, what was the condition of those doors?

A. Perfect condition.

Q. When you left, did you lock the house?

A. Yes, I did.

Q. Do you know this defendant?

A. Yes, I do. He is my next door neighbor.

Q. Had you given the defendant or anyone else permission to come in your house that day and take anything out of it?

A. No, I didn't.

Q. Did you report this to the police?

A. Yes, I did.

Record at 16–17.

Detective Bellizzie further testified that on July 8, 1981, after advising the young defendant of his constitutional rights, he conducted the following colloquy with the defendant:

"Q. Can you read and write the English language?

A. Yes.

Q. How far did you go in school?

A. Eleventh grade.

Q. Go on in your own words and tell me about the burglaries at 4718 North 9th and at 4700 North 9th, the place across from you.

A. While the one at 4718 North 9th Street was out, D-Don, he lives across the street from me, next to the other house we broke into. He had been working in the house at 4718 North 9th Street and knew what they had in there. He came over my house for money. We broke in and asked me if I wanted to get paid with him. I said yeah. It was about 9:30 or 10 o'clock in the morning. Then D-Don went around up the alley and I stayed in my house.

We broke out the window in the back of 4718, and then I went over and we both went in the place. D-Don took a rifle and I took a watch. Then we took the stuff over to my house. Then D-Don left and I stayed home.

Q. What do you mean by the phrase, get paid?

A. You know, to make money do things, to make money.

Q. Who has the gun now?

A. I don't know. D-Don cut it down, but I think he sold it.

Q. What did you do with the watch?

A. Sold it to a guy on the street.

Q. Do you have anything else to say about the burglary at 4718 North 9th?

A. No."

Q. After he gave you the statement, the defendant, did he read the statement?

A. I believe I read it to him.

Record at 18–19.

Following the testimony, the court adjudicated Donald Hill a delinquent, noted his prior robbery and burglary charges and prior commitments to juvenile training centers and committed him to an open setting at Cornwells Heights.

This appeal followed.[1]

In *Commonwealth v. Starkes,* 461 Pa. 178, 335 A.2d 698 (1975), Roddy Starkes was being investigated by the police concerning the death of one Edward Stradling, who had been stabbed in the back. Starkes, at the time of the investigation, was fourteen years of age. Investigating officers arrived at the residence of the Starkes and advised his mother that they were conducting an investigation concerning the death of Mr. Stradling and that her son was a suspect. At the request of the officers, the juvenile was taken to the homicide unit for questioning. Under attack on appeal was a statement given by the boy to the police. Our supreme court held:

The Commonwealth has the burden of proving, by a preponderence of the evidence, that the accused's confession was obtained after a knowing and intelligent waiver of his constitutional safeguards. *Commonwealth v. Goodwin,* 460 Pa. 516, 333 A.2d 892 (1975) (J–326 of 1974); *Commonwealth*

1. Appellant's brief frames the statement of questions involved as follows:

Did not the lower court err by failing to suppress the statement of appellant, a juvenile, where:

1) the police initially obtained a waiver of *Miranda* rights without first providing appellant with an opportunity to consult with an informed and interested adult,

2) when an opportunity to consult was subsequently provided, it occurred in the presence and hearing of the arresting officer, and

3) the record fails to establish that the appellant thereafter waived his *Miranda* rights prior to giving a statement?

Brief for Appellant at 2.

*v. Ewell,* 456 Pa. 589, 319 A.2d 153 (1974); *Commonwealth v. Fogan,* 449 Pa. 552, 296 A.2d 755 (1972); *Commonwealth ex rel. Butler v. Rundle,* 429 Pa. 141, 239 A.2d 426 (1968).

Most recently, we observed in *Commonwealth v. Goodwin, supra,* that:

"The United States Supreme Court in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) stated that an individual under custodial interrogation, who has been informed properly of his privilege against self-incrimination and the right to counsel, may elect to waive these constitutional rights. However, the Court emphasized that any waiver must be knowing, intelligent and voluntary. *Miranda v. Arizona,* supra at 444, 86 S.Ct. 1602; *Commonwealth v. Purvis,* 458 Pa. 359, 326 A.2d 369 (1974); *Commonwealth v. Alston,* 456 Pa. 128, 317 A.2d 241 (1974); *Commonwealth v. Simms,* 455 Pa. 599, 317 A.2d 265 (1974); *Commonwealth v. Banks,* 454 Pa. 401, 311 A.2d 576 (1973); *Commonwealth v. Riggins,* 451 Pa. 519, 304 A.2d 473 (1973); *Commonwealth v. Eiland,* 450 Pa. 566, 301 A.2d 651 (1973); *Commonwealth v. Davenport,* 449 Pa. 263, 295 A.2d 596 (1972); *Commonwealth v. Koch,* 446 Pa. 469, 288 A.2d 791 (1972); and *Commonwealth ex rel. Butler v. Rundle,* 429 Pa. 141, 239 A.2d 426 (1968)." Id 460 Pa. at 520-531, 333 A.2d at 894.

In determining the validity of an alleged waiver, we have ruled that it be the product of a free and uncoerced decision:

"The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. *Is the confession the product of an essentially free and unconstrained choice by its maker?* If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. *Rogers v. Richmond,* 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760. The line of distinction is that at which governing

self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession." (Emphasis added). *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961).

See also, *Commonwealth v. Goodwin, supra,* and cases cited therein.

Further, in determining the voluntariness of the waiver, all attending factors and circumstances must be considered and evaluated:

"... [T]he duration, and the methods of interrogation; the conditions of detention, the manifest attitude of the police toward the defendant, the defendant's physical and psychological state and all other conditions present which may serve to drain one's powers of resistance to suggestion and undermine his self-determination. See *Culombe v. Connecticut,* supra [367 U.S.] at 602, [81 S.Ct. at 1860]; *Commonwealth ex rel. Butler v. Rundle,* supra [429 Pa.] at 151, 239 A.2d at 431; *Commonwealth v. Eiland,* supra [450 Pa.] at 574, 301 A.2d at 654; *Commonwealth v. Riggins,* supra [451 Pa. 519] at 525, 304 A.2d [473] at 476; *Commonwealth v. Banks,* supra [454 Pa.] at 407, 311 A.2d at 579. As we have noted, when the question of voluntariness passes beyond the realm of physical coercion and into degrees of psychological coercion, most careful attention will be afforded to any facts, circumstances or events tending to overbear the will of the accused. *Commonwealth ex rel. Butler v. Rundle, supra* [429 Pa.] at 149, 239 A.2d at 430." *Commonwealth v. Alston,* 456 Pa. 128, 134, 317 A.2d 241, 244 (1974).

See also, *Commonwealth v. Goodwin, supra.*

In addition, we have recognized that where the accused is a child of tender years closer scrutiny must be given in determining the adequacy of the waiver.

"... [T]hat where the person involved is of tender years, the attending circumstances must be scrutinized with special care before an intelligent and knowing waiver is

declared." *Commonwealth v. Fogan, supra,* 449 Pa. at 558, 296 A.2d at 758.

See also, *Commonwealth v. Jones,* 228 Pa.Superior. 789, 315 A.2d 280 (1974) (J–355 of 1973); *Commonwealth v. Porter,* 449 Pa. 153, 295 A.2d 311 (1972); *Commonwealth v. Moses,* 446 Pa. 350, 287 A.2d 131 (1971); *Commonwealth v. Darden,* 441 Pa. 41, 271 A.2d 257 (1970), cert. denied, 401 U.S. 1004, 91 S.Ct. 1243, 28 L.Ed.2d 540 (1971).

Specifics such as age, intelligence, mental and physical development of the minor suspect are relevant factors in a determination as to whether or not the admissions were the product of a free and unfettered will and made only after a full appreciation of the rights that protect him.

In *Commonwealth v. Roane,* 459 Pa. 389, 329 A.2d 286 (1974) we observed:

"An important factor in establishing that a juvenile's waiver of his constitutional rights was a knowing and intelligent one would be evidence that, before he made his decision to waive those rights, he had access to the advice of a parent, attorney, or other adult who was primarily interested in his welfare." *Id.,* 459 Pa. at 393, 329 A.2d at 288.

. . . .

Where an informed adult is present the inequality of the position of the accused and police is to some extent neutralized and due process satisfied. However, where the adult is ignorant of the constitutional rights that surround a suspect in a criminal case and exerts his or her influence upon the minor in reaching the decision, it is clear that due process is offended. An uninformed adult present during custodial interrogation presents an even greater liability. The minor in such a situation is given the illusion of protection, but is in fact forced to rely upon one who is incapable of providing the advice and counsel needed in such a situation.

Unless we require police officers to also advise parents, who are in the position to counsel minor suspects during

custodial interrogation, we will not only fail to assure the full benefits sought to be attained by this type of counseling but we will also increase the likelihood that the suspect will be misinformed as to his rights.

*Commonwealth v. Starkes,* 461 Pa. at 183–186, 188, 335 A.2d at 700–01, 703.

■ The Commonwealth has established by a preponderence of the evidence that the accused's confession was obtained after a knowing and intelligent waiver of his constitutional safeguards. The record is clear that while under custodial interrogation, Donald Hill was informed properly of his privilege against self-incrimination and the right to counsel and that he elected to waive these constitutional rights. We find that such waiver was knowing, intelligent and voluntary. We also find that before he waived his constitutional rights he had access to the advice of a parent who was primarily interested in his welfare. We find, as Judge Tranchitella did below, that Donald Hill's parent was properly informed of the constitutional rights that surround a suspect in a criminal case. Where a parent is present, we must at least require that parent to be advised of the rights possessed by the minor suspect before that parent may be permitted to influence the decision which the minor must make. *Commonwealth v. Starkes, id.,* 461 Pa. at 189, 335 A.2d at 703. Such was the situation in the present case.

Order affirmed.[2]

2. Our case is clearly distinguishable from *Commonwealth v. McCutchen,* 463 Pa. 90, 343 A.2d 669 (1975) where the minor was not given the opportunity to consult his mother *before* he waived his rights, an opportunity mandated by *Commonwealth v. Roane,* 459 Pa. 389, 329 A.2d 286 (1974). Donald Hill was given the benefit of parental guidance prior to giving his confession. Cf. *Commonwealth v. Wade,* 485 Pa. 453, 402 A.2d 1360 (1979) where the record contained no indication that appellant either affirmatively stated that he understood the *Miranda* warnings or that he affirmatively waived those rights. Having so found, the Supreme Court did not need to determine whether appellant was afforded an opportunity for consultation with an interested and informed adult.