451 A.2d 690

**COMMONWEALTH of Pennsylvania**

v.

**Lloyd A. ROCHESTER, Appellant.**

**COMMONWEALTH of Pennsylvania**

v.

**Ronald WALSTON, Appellant.**

Superior Court of Pennsylvania.

Submitted Dec. 16, 1981.

Filed Oct. 1, 1982.

Petitions for Allowance of Appeal Denied March 18 and June 13, 1983.

Robert F. Pappano, Assistant Public Defender, Media, for appellants.

Vram Nedurian, Jr., Assistant District Attorney, Media, for Commonwealth, appellee.

Before WICKERSHAM, BECK and POPOVICH, JJ.

POPOVICH, Judge:

This is a consolidated appeal involving two juveniles, Ronald Walston and Lloyd Rochester, each found guilty after a jury trial of involuntary manslaughter, robbery, and conspiracy. We affirm.

The facts surrounding the instant appeal, as summarized by the court below are as follows:

On December 26, 1979, the victim, John McGinn, was robbed in the City of Chester, Pennsylvania. As a result of the incident, the victim suffered a heart attack and was

taken to a nearby hospital where he died on January 19, 1980.

When the police were investigating the incident, they received a statement from Gary Williams, who implicated one of the appellants, Lloyd Rochester, in the robbery. The court issued an order authorizing the police to take Rochester into custody in order to have fingerprints and photographs taken. During the time that Rochester was at the police station waiting for his parents to arrive, another youth, William Walston, brother of appellant Ronald, implicated Lloyd Rochester in the robbery. Before the police questioned Rochester, he was given *Miranda* warnings in the presence of his mother. After Rochester examined the statement made by William Walston, Rochester agreed to make a statement.

The other appellant, Ronald Walston, also was implicated in the robbery. However, Walston, at the time, was in the state of Maryland where he had been arrested. Walston waived extradition, and, as a result, he was remanded to the custody of the Delaware County Sheriff in Pennsylvania. When Walston arrived at the police station, his mother was summoned, and the police read Walston's *Miranda* warnings in the presence of his mother. Questioning by the police began, and Walston then proceeded to implicate two *other* individuals at which time the interrogating officer informed Walston that he had more than enough evidence to prosecute him.

Subsequently, Ronald Walston's mother advised him to speak the truth. At this time, Ronald Walston gave an inculpatory statement. A redacted version of the statement was introduced by the police officer at the trial and also was used for impeachment purposes at trial after he testified on his own behalf. Rochester's statement was not introduced into evidence by the prosecution at the trial, although the prosecution alluded to the statement in cross-examining him.

Initially, the court suppressed the statements made by both appellants on the grounds that the police failed to advise the juveniles and the interested adults after advising

them of their *Miranda* rights that they can consult with each other *in private before* any interrogation can proceed. The prosecution subsequently filed a petition for reconsideration in light of the remand ordered by the United States Supreme Court to our Supreme Court in *Commonwealth of Pennsylvania v. Henderson,* 446 U.S. 905, 100 S.Ct. 1829, 64 L.Ed.2d 256 (1980) for further consideration in light of a decision stating that a totality of the circumstances approach is adequate to determine whether a juvenile has waived his *Miranda* rights under federal law. *See Fare v. Michael C.,* 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979). A hearing was held, and the court below reversed its position. This appeal followed.

■■■■ Objections were made at trial and post-trial and the issue is, therefore, preserved for review. The first issue presented in this appeal is whether the prosecution met its burden of proving by a preponderance of the evidence that appellants knowingly, voluntarily, and intelligently waived their *Miranda* rights. *See Commonwealth v. Thomas,* 486 Pa. 568, 406 A.2d 1037 (1979); *Commonwealth v. Smith,* 472 Pa. 492, 372 A.2d 797 (1977). Because appellants were both juveniles at the time of their arrests, the prosecution in establishing its burden had to prove that the appellants had access to the advice of an attorney, parent, or other interested adult in addition to proving that the consulted adult was informed as to the constitutional rights available to the minor and as to the consequences attendant to the election made. *See Commonwealth v. Schroth,* 495 Pa. 561, 435 A.2d 148 (1981). Appellants suggest that the suppression court erred when it concluded that the statements were admissible. Hence, on appeal our duty is to examine the record of the suppression court and "determine whether the record supports the factual findings of the court below and the legitimacy of the inferences and legal conclusions drawn from those findings." *Commonwealth v. Brown,* 473 Pa. 562, 566, 375 A.2d 1260, 1262 (1977) (*quoting Commonwealth v. Goodwin,* 460 Pa. 516, 521, 333 A.2d 892, 895 (1975)). The scope of the rule governing a juvenile defendant's waiver of

his *Miranda* rights in Pennsylvania, as the *McCutchen*[1] or "interested adult" rule, is the crux of the issue before this Court today. Appellants contend that the police should have informed the juveniles that they have an opportunity to consult in private before any interrogation may proceed. We cannot agree with appellants.

The reasoning behind the *McCutchen* rule is that

"the inexperience of the minor affects not only his or her ability to understand the full implication and consequences of the predicament but also renders the judgment inadequate to assess the spectrum of considerations encompassed in the waiver decision. It was therefore reasoned that the impediment of immaturity can only be overcome where the record establishes that the youth had access to the advice of an attorney, parent, or other interested adult and that the consulted adult was informed as to the constitutional rights available to the minor and aware of the consequences that might follow the election to be made." *Commonwealth v. Smith,* 472 Pa. at 498, 372 A.2d at 800.[2]

In examining whether the dictates of *Commonwealth v. McCutchen, supra,* have been followed, our courts have articulated three factors: "(1) the juvenile must be given the opportunity to consult with an adult[3]; (2) the adult

---

**1.** *Commonwealth v. McCutchen,* 463 Pa. 90, 343 A.2d 669 (1975).

**2.** The United States Supreme Court has stated similarly:

"[The juvenile defendant] cannot be compared with an adult in full possession of his senses and knowledgeable of the consequences of his admissions. He would have no way of knowing what the consequences of his confession were without advice as to his rights—from someone concerned with securing him those rights—and without the aid of a more mature judgment as to the steps he should take in the predicament in which he found himself. A lawyer or an adult relative or friend could have given the petitioner the protection which his own immaturity could not. Adult advice would put him on a less unequal footing with his interrogators." *Gallegos v. Colorado,* 370 U.S. 49, 54–55, 82 S.Ct. 1209, 1212, 8 L.Ed.2d 325 (1962).

**3.** *See e.g., Commonwealth v. Barnes,* 482 Pa. 555, 561, 394 A.2d 461, 464 (1978) (no waiver because minor could not *reject* an opportunity to consult with a concerned adult); *Commonwealth v. Graver,* 473

must be one who is genuinely interested in the welfare of the accused juvenile [4]; and (3) the interested adult must be informed and aware of those Fifth and Sixth Amendment rights guaranteed to the juvenile.[5]" *Commonwealth v. Barnes,* 482 Pa. at 560, 394 A.2d at 464 (citations added).

Pa. 473, 375 A.2d 339 (1977) (no waiver where appellant was separated from his mother and later confessed without being given an opportunity to consult); *Commonwealth v. Smith, supra* (no waiver where the alleged interested adult unilaterally decided not to participate in the consultation); *Commonwealth v. Gaskins,* 471 Pa. 238, 240, 369 A.2d 1285, 1286 (1977) (no waiver where there was "[n]o consultation prior to the waiver was permitted at the Police Administration Building" when appellant was interrogated by the police.); *Commonwealth v. McFadden,* 470 Pa. 604, 611, 369 A.2d 1156, 1160 (1977) (waiver where mother and son, a juvenile defendant, were "left in each other's company for ten minutes", there was an opportunity to consult.); *Commonwealth v. Hailey,* 470 Pa. 488, 511, 368 A.2d 1261, 1273 (1977) (plurality opinion) (no waiver where appellant's first access to the advice of an interested adult was provided six hours after questioning during which time appellant had already incriminated himself and the prosecution "did not establish that the father, at the time of his belated entrance, was in fact provided an opportunity to confer...."); *Commonwealth v. Lee,* 470 Pa. 401, 403, 368 A.2d 690, 691 (1977) (no waiver where "appellant was not allowed to consult with his parents until after he had given his original confession.").

4. *Commonwealth v. Veltre,* 492 Pa. 237, 239, 424 A.2d 486, 487–88 (1981) (Opinion In Support of Affirmance by Larsen, J., joined by Flaherty and Kauffman, JJ.) (although probation officer was not an interested adult, appellant's waiver was knowingly, understandingly, and voluntarily made under the totality of the circumstances.); *Commonwealth v. Thomas, supra* (Prison counsellor was not an interested adult); *Commonwealth v. Smith,* 472 Pa. at 500, 372 A.2d at 801 (no irrebuttable presumption that a parent is an interested adult; hence, where "the disinterest of the parent was graphically demonstrated, the parent was not an interested adult.")

5. *Commonwealth v. Hackett,* 484 Pa. 43, 398 A.2d 651 (1979) (no waiver where no evidence that juvenile defendant's mother was informed.); *Commonwealth v. Graver, supra* (no waiver where appellant's mother was not informed "of the rights available to her son, the mother could not be termed an informed adult."); *Commonwealth v. Smith, supra* (no waiver where no evidence that the adult comprehended the rights of the minor.); *Commonwealth v. Hailey,* 470 Pa. at 492, 368 A.2d at 1263 (no waiver where the prosecution did not establish that "the father was in fact aware of the options available to appellant."); *Commonwealth v. Webster,* 466 Pa. 314, 328, 353 A.2d 372 (1975) (no waiver where prosecution's evidence fails to show that mother was advised of accused's *Miranda* rights.);

Although certain language appearing in a prior opinion of our Supreme Court [6] would seem to indicate that a fourth requirement has been engrafted onto the *McCutchen* rule, the statement was dictum and hence is not binding upon us. *See Hunsberger v. Bender,* 407 Pa. 185, 180 A.2d 4 (1962). In *Commonwealth v. Barnes, supra,* appellant, a juvenile, was transported to the police station and later questioned without first being given his *Miranda* rights. Appellant indicated a desire to waive his rights and also stated that he did not want his father to be present at that time. Our Supreme Court applied the three factors enunciated above (i.e., opportunity to consult, interested adult, and an informed adult) and concluded that "the Commonwealth did not satisfy these prerequisites." *Id.,* 482 Pa. at 560, 394 A.2d at 464. Additionally, that Court stated:

"Shortly after appellant's arrival at the PAB, the police knew where appellant resided, and that he lived with his father. In spite of this knowledge, the record shows no effort by police to contact appellant's father before interrogating appellant about the homicide. In fact the only evidence leads to the conclusion that appellant's father was only notified of his son's status shortly before the arraignment, some five or six hours *after* appellant made his inculpatory statement. The only adults 'consulted' by appellant prior to arraignment were police officers. The Commonwealth argues that appellant voluntarily waived his right to consult with an interested and informed adult. To accept this argument would render meaningless the protection afforded to juveniles by *McCutchen.* The essence of our doctrine relating to juvenile waiver is that the benefit of consultation with counsel or an interested, concerned and knowledgeable adult prior to a decision to waive Fifth and Sixth Amendment rights counterbalances the immaturity of the youthful accused. *Commonwealth*

Commonwealth v. Smith, 465 Pa. 310, 350 A.2d 410 (1976) (no waiver where mother was not informed of her son's *Miranda* rights.).

**6.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

*v. Smith, supra.* It is only after *a meaningful consultation has taken place that it can be found that the disadvantage* occasioned by the juvenile's immaturity has been offset to some degree. Since the ultimate decision, even after the consultation, must be made by the juvenile, his immaturity can not be completely removed from the equation. At best we can hope by this process to impress upon him the seriousness of the decision and to apprise him of his options and the consequences that might follow the path he elects. The Commonwealth lays great stress on the fact that appellant expressed a desire not to speak with his father. This is the type of decision that reflects the immaturity that the doctrine is designed to guard against. Obviously the appellant was more concerned with parental disapproval and failed to perceive the more important need at that moment for consulting with one who was concerned with his welfare. It is only after a meaningful consultation that we can be satisfied that the juvenile possesses an informed judgment capable of making such a grave decision. We therefore decline to adopt the argument urged by the Commonwealth."

*Id.,* 482 Pa. at 560, 394 A.2d at 464 (footnote omitted) (Emphasis added); *See also Commonwealth v. Smith,* 472 Pa. at 502, 372 A.2d at 803 (Concurring Opinion by Manderino, J.) ("I would like to add, however, that in addition to the three pre-requisites discussed by the majority opinion, the prosecution must show that meaningful consultation between the juvenile and the interested and informed adult actually took place.")

Thus, our Supreme Court's decision in *Barnes* was reached after applying the traditional three step analysis.[7]

**7.** We note also that our own Court has suggested that "[t]he court in *Barnes* added a fourth requirement that the mandatory consultation is a *meaningful* one[;]" however, this language also is not binding since in that case, we said the following:

"Clearly, the rule in *Barnes,* which is a per se one,[*] was not followed in the instant interrogation. *No warnings whatsoever were given,* much less an opportunity for consultation prior to the confession." *In Re Miller,* 294 Pa.Super. 322, 328, 439 A.2d 1222, 1225 (1982) (emphasis added).

When those criteria are applied to the record before us, we are satisfied that appellant voluntarily, understandingly, and intelligently waived his *Miranda* rights.

Although appellants were arrested at different times, the record shows that no questioning commenced until each appellant had been informed of his *Miranda* rights. Additionally, interested adults were present at the time the police had informed them of their rights. The police officers after each question asked both the appellants and their parents whether they understood the warnings, and there was no indication that they did not. The record indicates that the appellants' confessions were prompted by statements given by other actors implicating both appellants.

█ Appellants contend that the statements they gave were not voluntarily, understandingly, and intelligently given because the police failed to inform them and their parents before questioning that they had the right to confer out of the presence of the police officers. Because a private consultation was not afforded in this case, appellants argue that their statements must be suppressed as matter of law. Requiring the prosecution to prove additionally that the appellant and the interested adult met in private (i.e., out of the presence of the police officers) creates an irrebuttable presumption that the adult's presence at the hearing was insufficient to offset the "overbearing presence of the law" during the interrogation. *Haley v. Ohio,* 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948). Although our Supreme Court in *Commonwealth v. Roane,* 459 Pa. 389, 329 A.2d 286 (1974) stated in a similar case that the interested adult's "mere presence [was] not enough", *id.,* 459 Pa. at 395, 329 A.2d at 289, that case is distinguishable. In *Roane,* the police ignored the defendant's mother's request to seek the advice of counsel. That Court stated the following:

"Since the record indicates that the Commonwealth first attempted to exclude appellant's mother from the interro-

In view of the fact that no warnings were given, this Court's pronouncements about the type of "meaningful consultation" which must be given also is dictum.

gation and then, when she finally gained access, did not afford her an opportunity to advise her son privately about his constitutional rights, although she indicated that she wished him to be afforded the right of counsel, we hold that the Commonwealth failed to establish that appellant's waiver of his rights was a knowing and intelligent one. Accordingly, his confession should have been suppressed." *Id.*

Thus, because the parent did not join in the waiver, our Supreme Court concluded that the defendant was denied the opportunity to consult. In the instant case the parent advised the juvenile to speak the truth and did not request the advice of counsel. Under these circumstances, we are satisfied that the prosecution met its burden in establishing that appellants entered into a voluntary, understanding, and intelligent waiver of their *Miranda* rights since the record indicates that a parent was present during each interrogation. *See Commonwealth v. Starkes*, 461 Pa. 178, 189, 335 A.2d 698, 703 (1975) (plurality opinion) ("where an informed adult is present the inequality of the position of the accused and police is to some extent neutralized and due process satisfied.").

In any event, with respect to appellant Rochester, the record reveals that appellant testified substantially in accord with his statement; therefore, appellant's allegation of error may have been harmless under the circumstances. *See Commonwealth v. Rice*, 271 Pa.Super. 425, 413 A.2d 739 (1979).

With respect to the other issues raised, with one exception, those issues are similar. Appellant, Ronald Walston, argues separately that his statement should be suppressed "because it was a product of coercion arising out of the totality of the circumstances." Brief for Appellant at 9. Appellant bases his argument on the following alleged psychologically and physically coercive police tactics:

"The appellant had not eaten since breakfast. He testified that he was scared. It is argued that Commodore Harris was both overbearing and overreaching; also, that

he threatened the appellant. It is also argued that Harris was in a hurry and did not adequately explain either the charges against the appellant or the *Miranda* warnings to either him or his mother." *Id.*

Appellant's contention concerns the voluntariness of his statement which he gave to the police which must be examined in accordance with the following guidelines:

"The test of voluntariness is whether the confession was the product of an essentially free and unconstrained choice by its maker. *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037, 1057 (1961). In determining the voluntariness of a statement, the totality of the circumstances must be considered. *Commonwealth v. Starkes,* 461 Pa. 178, 184, 335 A.2d 698, 701 (1975). More specifically, there must be considered the age of the accused; his education level; his inteeligence; his physical state; the duration and method of interrogation; the conditions of detention; the advice given to him concerning his constitutional rights; and any other circumstances pertinent to the inquiry." *Commonwealth v. Eackles,* 286 Pa.Super. 146 at 151, 428 A.2d 614 at 617.

Applying these standards, the record reveals that appellant Walston was 15 years of age at the time of his arrest. Additionally, at the time that an arrest warrant was filed against him in Pennsylvania, he was at a juvenile facility for delinquents because of theft and robbery charges brought against him in Salisbury, Maryland. After appellant waived extradition, he arrived at the police station in Delaware County, Pennsylvania. Appellant's mother arrived at the station, and she was informed by Detective Harris in the following manner:

"A Pursuant to law I am informing you that I am Sergeant Commodore Harris of the Chester Police Department. You are now in custody and charged with homicide and other crimes, aggravated assault and others and may be charged with other crimes. You have the right to remain silent. However, if you say anything, you can and—anything, such can and will be used against you in a

court of law. Do you understand this? Both of them said they understood. You have the right to talk to a lawyer before answering any questions and have a lawyer with you before and during questioning. Do you understand this? And he said, yes, he did. And his mother said she understood. If you cannot afford a lawyer you have the right to have a free lawyer appointed for you before any questions are asked and during any questioning. This free lawyer is at no expense or cost to you. Do you understand this? And both of them stated that they did.

During questioning, you may stop at any time and refuse to answer any further questions. Do you understand this? And both of them said that they did. Do you want a lawyer? And they said no. He didn't want a lawyer. And he said, no, because he didn't have anything to do with it.

Q Is that what he said?

A Yeah. He didn't have anything to do with it at that time.

Q Now, approximately what time did that take place that you warned him of his rights?

A That was about twenty minutes to four, twenty minutes to five, somewhere around in there.

Q What next happened?

A Then I went to type up a sheet advising them of the rights and everything on the statement sheet.

Q All right. That is the same procedure?

A The same procedure.

Q That is applied to the other three statements as well; is that right?

A That is correct.

Q The questions that you asked on the statement sheet and the responses that you received, the statements were read to both the mother and also to Ronald?

A That's correct.

Q And the answers would have been from both of them?

A That's correct.

Q Now, while they were there, that is Ronald was there, did he talk with his mother?

A Yes.

Q Do you recall what he said to his mother?

A I can't explain—I think—in order for me to answer that question, I would have to go to another question that you're going to ask me in reference to about the statement, see, before I can even—o.k., if you want me to, I will explain to you what I did, all right?

Q Very well.

A What had happened was after he signed the sheet and everything—

Q The statement sheet?

A The statement sheet and everything his mother and him—his mother told him tell the truth exactly what happened, o.k. So he starts in the story that he did nothing, that his brother William did nothing, just Lloyd and Lloyd—

THE COURT: James?

A And James did it all, you know. So then I showed him the statements that I received from the three brothers—from the three other gentlemen and also the—what his brother had stated to me, his brother William had stated to me that he had done." (Notes of Suppression Hearing at 70–73).

 Appellant Walston eventually confessed after his mother encouraged him to speak the truth. Despite appellant's allegations that the police coerced his confession, the prosecution's evidence contradicted that evidence. Hence, the question of voluntariness was properly submitted to the jury, and the jury's resolution of that issue will not be disturbed on appeal since it is supported by the record.

 Appellant Rochester argues that his statement should be suppressed on an additional ground. That is, Rochester contends that his statement was the product of an illegal arrest. We cannot agree.

The record reveals that Rochester was picked up by the police in order to have photographs taken in furtherance of a police investigation. The court issued an order pursuant to 42 Pa.C.S.A. § 6324 which provides:

"A child may be taken into custody:

(1) Pursuant to an order of the court under this chapter.

(2) Pursuant to the laws of arrest.

(3) By a law enforcement officer or duly authorized officer of the court if there are reasonable grounds to believe that the child is suffering from illness or injury or is in imminent danger from his surroundings, and that his removal is necessary.

(4) By a law enforcement officer or duly authorized officer of the court if there are reasonable grounds to believe that the child has run away from his parents, guardian, or other custodian.

(5) By a law enforcement officer or duly authorized officer of the court if there are reasonable grounds to believe that the child has violated conditions of his probation.

1976, July 9, P.L. 586, No. 142, § 2, effective June 27, 1978."

Additionally, since appellant Rochester was fifteen years of age the police had "the authority to take or cause to be taken the fingerprints or photographs, or both, of any child 15 years of age and older who is alleged to have committed a delinquent act. . . ." 42 Pa.C.S.A. § 6308(c)(1).

At the time that appellant Rochester was taken to the police station for photographing and fingerprinting, the record shows that appellant would have been free to leave. However, while Rochester was at the station, he was implicated in the robbery by two other individuals. Thus, under these circumstances, Rochester's arrest was not illegal since probable cause coalesced while appellant was at the police station.

The next issues concerns both appellants and whether the trial court erred in refusing to appoint a forensic pathologist to aid defense counsels in preparing their case.

A review of the record discloses that even though both appellants asserted their innocence in the criminal episode, they argued that a pathologist was necessary because a period of one month lapsed between the time that the robbery occurred and the date that the victim died.

Defense counsel for appellant requested that the court appoint a pathologist during the suppression hearing. The following colloquoy occurred:

[Attorney for Appellant Rochester]

"MR. FRIEDMAN: Your Honor, I have two motions still left in my omnibus motion. One, a motion for appointment of a special investigator which I very much need in this case for a number of witnesses and the other which I vitally need in this case is a motion for appointment or an allowance for a forensic pathologist. The forensic pathologist, perhaps I should state—this was a situation where the alleged attack occurred on December 26th.

THE COURT: Oh, I understand—

MR. FRIEDMAN: It was more than three weeks.

THE COURT: I read the notes of testimony as I indicated and I read the medical examiner's testimony and I understand that some might contend that there is a problem as to causation; I understand that.

MR. FRIEDMAN: I should add that as far as the cost of this goes, Ronald Walston's counsel and I have discussed this as for all of us having agreed that if the cases were not severed that they would share in the use of a forensic pathologist. We are not trying to obtain exorbitant sums of money from the County for this purpose, but that causation issue since it is now to be a joint trial would be a joint issue.

THE COURT: Have you spoken to anybody?

MR. FRIEDMAN: A pathologist?

THE COURT: Yes.

MR. FRIEDMAN: I have spoken to a pathologist. He is not a forensic pathologist. I have spoken to him informally. I have spoken to several other physicians who are members of my family regarding this. And it affirms my need for a forensic pathologist.

THE COURT: I suggest you find out what a pathologist is going to charge you and I will tell you whether I am going to approve that charge or whether I won't approve it. I just can't give you a blank check."

Notes of Suppression Hearing at 73a–75a.

According to appellee, the court denied the request after it was informed that the estimated cost of a pathologist would be $1,000.00 for testifying in court and $500.00 for preparing that testimony. Appellee's brief at 20. However, the record fails to elaborate on whether further action was taken on this issue. Nonetheless, despite this irregularity, we have addressed the merits of the issue in the interest of judicial economy.

To begin with, there is no constitutional obligation in Pennsylvania to provide expert assistance at the Commonwealth's expense. Additionally, there is no statutory mandate authorizing payment specifically for the appointment of a pathologist or other expert witness. *See Commonwealth v. Davy,* 456 Pa. 88, 317 A.2d 48 (1974) (where a legislative act "placed the costs of misdemeanor prosecutions upon the county in the first instance."); *See also* 42 Pa.C. S.A. §§ 1722(a)(1), 3722, and 5903; *See generally* ABA Standards, Providing Defense Services § 1.5. In view of the above, the pertinent question becomes whether the trial court abused its discretion in denying the appointment of a forensic pathologist. We conclude not.

According to the record, attorneys for both appellants cross-examined vigorously the prosecution's expert witnesses, the victim's internist and the medical examiner, whose testimony when combined established that the assault on the victim triggered a series of events which eventually led to his death on January 19, 1980, notwithstanding the fact that

the victim had a history of heart problems. Under these circumstances, no abuse of discretion occurred.

■■ The next issues raised is whether the trial court erred when it denied a motion for a mistrial because of prejudicial trial publicity.

The following scenario is contained in the record:

One evening before the trial was adjourned for that day, the court cautioned the jurors to consider "only what [information] you have learned in this courtroom from the witness stand." Notes of Testimony at 326. However, that evening, an article appeared in the local newspaper which inaccurately summarized certain testimony. The substance of the article can be gleaned from the following remarks which were made at the trial:

"THE COURT: Members of the jury, I indicated at the beginning of the trial of this case that there may be delays and they would only be necessary delays, and this morning was another example of a necessary delay. Before we resume the trial, there is a matter that I would like to discuss with you. I have told you consistently that the only information that should guide you and influence you in arriving at your verdict is that information you all hear together, seated here together in this courtroom and the evidence comes from the witness stand. It has been brought to my attention that there was a newspaper account of yesterday's proceedings and I want to be sure that that newspaper account, if it has come to your attention, has not and does not influence you. Is there anyone among you, I am speaking to each of the fourteen of you, who has read any newspaper account either today or yesterday concerning this trial?

(Whereupon jurors raised their hands.)

THE COURT: Now, first of all, that was an obvious disregard of the Court's instructions. O.k., hands again. My information is the only newspaper account that was brought to my attention was an article in the Bulletin.

The four hands that went up, is it the Bulletin? Just nod yes or no.

(Whereupon, the jurors nodded in the affirmative.)

THE COURT: Now, that account was inaccurate and it distresses me that it was inaccurate, but it was. But be that as it may, as a result of what you read in the newspaper account, has anyone of you who read that account formed an opinion as to the guilt or innocence of these defendants?

(No response.)

THE COURT: The record will show there is no answer. As a result of what was read, have you been influenced in this case by what you read?

(No response.)

THE COURT: No answer. Is each of you able to put aside what you read and decide this case as I have indicated solely on the evidence presented in this court-room? Each of you who have raised your hands, do I take it from—first, juror No. 5, in light of what I said, would you be able to decide this case solely from the evidence presented in this courtroom?

A JUROR: Yes, Your Honor.

THE COURT: No. 6.

A JUROR: Yes, Your Honor.

THE COURT: No. 10.

A JUROR: Yes, Your Honor.

THE COURT: No. 12.

A JUROR: Yes, Your Honor."

Notes of Testimony at 342–345.

The newspaper article which the four jurors read referred to a hearing conducted out of the presence of the jury. A sidebar conference then followed during which time the court and defense counsel for Rochester summarized their views on the matter:

THE COURT: The Court has queried the jury about the conference that a newspaper article was reported to the Court's attention by Mr. Friedman. Mr. Friedman can

supply that article to the court reporter to be made part of the record in the case. As the Court read the article, the only possible prejudicial content was a reference to the out of the jury hearing concerning the willingness of witnesses Harris and Kelly Walston to testify. We had conducted that hearing because the District Attorney had information that they would not be willing to testify or would claim that they didn't remember. And in order to determine whether they would be willing to testify, we conducted the hearing out of the presence of the jury with the attorneys and the defendants present. Cornelia Harris did testify in that proceeding and testified before the jury. Kelly Walston testified in that proceeding but did not testify before the jury.

The newspaper account relates that Kelly Walston testified before the jury. That is the inaccurate part which the Court recalls. At this point, Mr. Friedman, do you want to add to that?

MR. FRIEDMAN: I think the article speaks for itself. It had a large headline which said, two girls claim four—or four boys or some such split money from mugging, I believe. In any case, I will supply the article to the reporter. It may or may not have said that that was outside the hearing of the jury or that it was before the hearing of the jury. Right at the moment, I cannot recall. In either way, it does make reference very clearly to Kelly Walston's statement which is corroborating Cornelia Harris' statement. It is for that reason, Your Honor, I move for a mistrial.

THE COURT: All right. The motion is refused.

MR. FRIEDMAN: Note my exception, Your Honor. (End of side bar conference.)"

Notes of Testimony at 345–347.

The above events must be examined in accordance with the applicable principles of law:

"It is well settled that the right to trial by jury includes a guarantee that the accused will get a fair trial before a panel of impartial jurors. *Turner v. Louisiana,* 379 U.S.

466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965). A jury's verdict must be based upon evidence presented in the course of the trial, not on extraneous commentary presented in the forum of public opinion by news media. *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). If a juror's decision is influenced by inflammatory news reports, an accused has been deprived of a fair trial and due process requires reversal of the conviction. *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

In *Commonwealth v. Bruno,* 466 Pa. 245, 352 A.2d 40 (1976), prejudicial publicity had occurred during trial. Several newspaper articles and radio spots disclosed the appellant's confession, earlier suppressed because violative of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The trial court refused to question the jurors and denied sequestration. Rather, the court gave several general cautionary instructions. The supreme court found that no meaningful effort had been made to secure an unprejudiced jury panel. The appellant was accordingly awarded a new trial. The *Bruno* court observed:

> 'When there is a possibility of highly prejudicial materials reaching the jury, the trial court must take appropriate protective action. Although the proper precautions are inevitably dictated by the circumstances of each case, they must reasonably ensure that no prejudice will occur.' 466 Pa. at 266, 352 A.2d at 51."

*Commonwealth v. Williams,* 262 Pa.Super. 508, 527–28, 396 A.2d 1286, 1295–6 (1978).

In the matter before us, the objectionable part of the article revealed that a witness's testimony corroborated that of another witness that appellant Rochester stated "we iced the m-f-er." Notes of Testimony at 96. The trial court informed the jury that this statement was inaccurate. The court also cautioned the jury in the following manner:

> "once again your only information must come to you while you are seated here together as the evidence is given to you from the witness stand. You must not consider any statements or articles about testimony which was not

presented in this courtroom. You must not consider the testimony of an alleged witness which was not presented to you. Please remember that. Thank you."

Notes of Testimony at 348.

Furthermore, appellant Rochester testified in his own behalf and denied making the statement; however, he did state that another individual who was not on trial had made the statement in his presence. On this record, the trial court did not abuse its discretion in refusing to declare a mistrial since "[t]he only possible prejudice the Court found was the mention of the unwillingness of the witnesses to testify." Trial Court's Opinion at 16. Thus, "it is clear that the court took adequate cautionary measures to ensure that no prejudice occurred to appellant[s]. This is all that due process requires." *Commonwealth v. Williams*, 262 Pa.Super. at 528, 396 A.2d at 1296.[8]

Judgments of sentence affirmed.

---

**8.** Although appellant Walston couches his claims concerning the appointment of a pathologist and the mistrial motion in terms of trial counsel's ineffectiveness since only appellant Rochester requested the court for such relief, we also have examined the underlying ineffectiveness issues and conclude that they are without merit. We have stated that counsel cannot be found to be ineffective for failing to raise baseless claim. *Commonwealth v. Johnson*, 490 Pa. 312, 416 A.2d 485 (1980).